[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1012 
The appellant, Marcus Fletcher, was indicted for the capital offense of murder during a robbery, as defined in Ala. Code 1975, § 13A-5-40(a)(2). A jury found him guilty as charged and, by a vote of eleven to one, recommended that he be punished by death. The trial court accepted this recommendation and sentenced the appellant to death. This appeal is from that conviction and sentence.
 I
The State's evidence in this case was entirely circumstantial. The appellant contends that this evidence is "simply not strong enough to be 'inconsistent with any rational hypothesis' of [his] innocence." Appellant's brief at 70. The evidence presented at trial can be summarized as follows:
On the evening of March 1, 1991, Carl Brown was brutally bludgeoned to death in the small combination grocery/delicatessen/gas station that he owned and operated in Athens, Alabama. Brown's body was discovered around 12:30 on the morning of March 2 by his father-in-law, Elton Abernathy, who lived about one-half block from the store. Abernathy went to the store to check on Brown at the request of Brown's wife, who was Abernathy's daughter. Abernathy stated that, although the store "appeared not to be open," the front door was unlocked and the television mounted near that door was on. R. 883-84. Upon seeing Brown's body lying on the floor some five to six steps from the front door, Abernathy returned to his house and telephoned the police.
Officers arriving at the scene observed that the keys to the front door were in the lock on the inside of the door, that some of the lights in the main area of the store were on, that a "closed" sign was hung on the door so that it showed to the outside, and that one of the two gas pump switches was on. The victim was lying on the floor on his right side with his head in a large pool of blood. The victim's wallet, which contained an unspecified amount of cash, was still on the victim's person, as were several items of jewelry. Athens police captain George Clem testified that there were no signs of a struggle in the store. He also stated that there were "what appeared to be drops of blood on the floor near [the victim's] feet," R. 933, that there was "what appeared to be blood on the door of the drink box or cooler located on the east wall near the right side of the body," R. 935, and that there was what "appeared to be blood" on the counter near the cash register, R. 941. The officers did not find anything that appeared to be the murder weapon in or near the store.
The cash register appeared to have been moved from its usual position on the counter and there were what "appeared to be pry marks" on the front of the register. R. 986. The register drawer was open and the tray spaces for the twenties, tens, fives, and ones were empty. There were coins and a number of checks in the tray and "[u]nder the checks . . . [were] three one hundred dollar bills and a fifty dollar bill." R. 942. The cash register was located at the closed end of a U-shaped counter. The switches for the gas pumps were located to the side of the cash register.
Ms. Dianne Spence was the victim's only employee at the store. She testified that Friday, March 1, 1991, had been a "good day" business-wise for the store, because many people had been in to pay on their credit accounts. R. 1152. Ms. Spence stated that by the time she left the store around 6:15 p.m., they had accumulated "a lot of cash, a considerable amount of cash." *Page 1013 
R. 1153. She estimated the amount of cash to have been around $1,000, although she acknowledged on cross-examination that she had initially told the police that she did not know how much cash had been in the register, but that it was probably $500 or more. Ms. Spence testified that when she left the store there were twenties, tens, fives, and ones in the register drawer and that the register was in its usual position on the counter. When she returned to the store at the request of the police during the early hours of March 2, the register had been moved from its usual position and the twenties, tens, fives, and ones were missing from the cash drawer.
Ms. Spence stated that Brown did not make bank deposits at night after closing. Instead, the cash and checks received during the day were placed in a bank deposit bag and hidden in a specific place in the store at night. According to Ms. Spence, only coins were left in the register drawer at night and the drawer was always left open. On the night Brown was killed, police officers found the bank bag on or near the counter where the cash register was located. No cash other than the bills located under the checks was found in the store.
In processing the victim's store the night of the murder, Sergeant Floyd Johnson attempted to lift prints from "[e]verything that was . . . printable between the cash register and in that . . . counter area and where Mr. Brown's body was located." R. 992. Sergeant Johnson lifted a palm print "[f]rom the left side of the cash register, facing the cash register on the left side." R. 1018. Although the bloodstain on the counter near the register appeared to contain a print, Johnson was unable to lift that particular print. Through his print processing, Sergeant Johnson obtained 41 latent prints, 5 of which were taken from the cash register. All of these prints were submitted for analysis, along with the appellant's known prints. The appellant's prints were the only known prints submitted for analysis in this case.
The fingerprint examiner, Marietta Prevost, testified that only 12 of the 41 latent prints were "of value," meaning that the prints could be identified. R. 1073. She identified the latent print taken from the left side of the cash register as the appellant's left palm print.[1] Ms. Prevost testified that she did not identify any of the other 11 prints of value, although she acknowledged on cross-examination that she could have sent those prints to the Federal Bureau of Investigation for computer comparison to the millions of known prints in its files. She also acknowledged that "a latent fingerprint can last over an extended period of time [(possibly in excess of one year)] if it's at a proper location." R. 1069. There was no testimony as to whether any of the other 11 prints of value were prints taken from the cash register.
The pathologist, Dr. Kenneth Warner, testified that the victim's cause of death was "cranial cerebral trauma," or, "in laymen's terms," "[i]njuries to the skull and the brain." R. 1095. The victim had seven lacerations on the back of his head and one laceration on the top of his head. Dr. Warner stated that the victim's injuries were consistent with being hit with a "baseball bat or a tire iron or anything like that," R. 1102, and that the injuries "were non-survivable," R. 1093. The victim also had several defensive type wounds on his left arm and hand.
During cross-examination, defense counsel asked Dr. Warner if "the number and the location of the blows that were inflicted on Mr. Brown . . . indicate[d] to [Warner anything] about the person who delivered *Page 1014 
those blows." R. 1097-98. Dr. Warner replied:
 "This was a great deal of overkill. Mr. Brown certainly could have died from one blow to the top of the head which would probably have put him on his knees, and then one blow to the back of his head which would have probably killed him. Yet, he had seven to the back of his head. So, that was six more than was needed which would imply that the person was either influenced by a drug, a stimulating drug, or there was a sexual component to the killing."
R. 1098. Dr. Warner also acknowledged that the circumstances of the killing could also indicate "that the person who delivered these blows was extremely angry with Mr. Brown." Id.
On re-direct examination, the prosecutor ascertained that Dr. Warner had treated people who had "abused cocaine" and who "were involved in drug use." R. 1114. The following then occurred:
 "Q. [By the prosecutor:] . . . [W]ould you explain why you would expect this kind of assault to have been conducted by someone who had used or abused drugs?
"A. Because of the overkill.
"Q. And what would explain that?
 "A. The normal response of an individual who hit someone over the head and sees them fall is one type of behavior. The drug response is a different type of behavior. Anything, overkill kinds of cases are usually explained by a stimulating drug, either amphetamines or cocaine.
 "Q. By stimulating drugs, another way to say it maybe in laymen's language, at least in my language, to say that that could make a person, for instance, hyper?
"A. Yes, sir." R. 1114-15.
Defense counsel brought out through Dr. Warner that, at the time of his death, the victim had two hand-rolled marihuana cigarettes in his shirt pocket and had traces of marihuana in his urine, but not in his blood or vitreous humor. In response to questions asked by the trial court, Dr. Warner stated that marihuana "usually makes [a] person calm, mellow," and "[j]ust the opposite" of angry, upset, or argumentative. R. 1103-04. When asked the significance of the fact that there were marihuana traces in the victim's urine and none in his blood or his vitreous humor, Dr. Warner stated that it "would tell [him] that the person was not acutely intoxicated or under the influence at the time of his death." R. 1104. The use of the marihuana "could have been two weeks before" the victim's death and "[p]robably did not" have any effect on his emotional state at the time of his death. Id. Responding to the court's question as to the type of mood or emotion produced by the use of cocaine, Dr. Warner related that "[c]ocaine is just the opposite [of marihuana]. Cocaine is a stimulant, and it makes the person aggressive." R. 1105.
Roger Andrews, a general contractor, testified that he had employed the appellant prior to and during March 1991. Andrews stated that, before the victim's death, all the gas for his business vehicles was purchased at the victim's store. Although the appellant was not permitted to drive the construction vehicles on the road, he was often in the victim's store when the vehicles were being fueled and Andrews had personally observed the appellant in the victim's store on numerous occasions. According to Andrews, his employees often purchased breakfast and/or sandwiches for their lunch at the victim's store. The appellant, like most of Andrews' employees, had a credit account at the victim's store.
Andrews testified that the appellant picked up his pay check at Andrews' home office on Friday, March 1. The appellant had not worked several days in the preceding week, and Andrews issued him a check in the amount of $50.54. Because he and his employees had worked late that Friday, Andrews was unable to complete the payroll until after the banks had closed. He therefore cashed the checks for his employees, including the appellant's, at his office. The appellant endorsed the $50.54 check, *Page 1015 
returned it to Andrews, and Andrews gave the appellant that same amount in cash.
According to Andrews, the appellant left his home office around 6:00 to 6:05. Andrews stated that he did not see the appellant again until the following Monday. At that time, the appellant told Andrews that he had been to the victim's store on the previous Friday and that he had paid $15 on his credit account. Andrews acknowledged on cross-examination that the appellant did not specify the time that he went to the victim's store.
Andrews also testified on cross-examination that he and his crews were in the victim's store on a daily basis, with crew members sometimes arriving at the store in the morning before he did. He acknowledged that he had himself turned on the gas pumps by operating the switches located beside the cash register.
Andrews stated that a man named Don Dailey had worked for him off and on for two years. According to Andrews, Dailey had stolen from him and was reputed to abuse drugs.
In answer to defense counsel's questions, Andrews stated that he had taken the appellant to the Athens police station after a warrant had been issued for the appellant's arrest. Andrews did this at the request of Athens police officers. In order to get the appellant to accompany him, Andrews told the appellant that they were going to pick up a saw. On re-direct examination, Andrews stated that when they reached the police station, the appellant refused to go in and had to be taken inside by two officers.
John Gordon testified that he and a friend were in the victim's store between 7:00 and 7:30 p.m. on the night of the murder. The store was still open at that time. Gordon stated that he purchased a few items, paying for them with a $20 bill. The victim made change for him from the cash register. Gordon stated that there were six people in the store at that time — himself, his friend, the victim, and "three individuals [who were] standing [to] the left hand side of the counter." R. 1170. The three people standing near the counter "seemed to be more friends [than customers]. They weren't making any purchases. They were standing around talking." R. 1171. He acknowledged on cross-examination that he had not seen any of those three people in the courtroom or out in the hall where witnesses were waiting.
Sharon Russell, a middle school teacher, testified that she and her husband left the house of some friends at 7:30 on the night of March 1 in order to pick up their grandchild, who was spending the night with them. It was dark at this time and her husband had turned on the car's headlights. As they came to the victim's store, Mrs. Russell saw "the[se] white things and then . . . realized they were tennis shoes and they were coming — they were in the grass" beside the road. R. 1179. Mrs. Russell stated that she called her husband's attention to this person so that her husband would not hit him. As the headlights shone on this person, Mrs. Russell could see "white high-topped tennis shoes," what "looked like a dark sweat shirt," and "the whiteness in the jeans, and there was something on the back pocket or there was something that the lights picked up." R. 1181. As the car passed this person he was within a foot of Mrs. Russell, who was in the passenger seat. Mrs. Russell described this person as a black male, "muscular, [with] short hair, and around six feet, five eleven and a half or something like that." R. 1181.
Donald Dailey testified that he was an acquaintance of the appellant. On the night of March 1, 1991, he met the appellant on a street corner at approximately 6:30 p.m. He stated that the appellant was wearing a jacket, stone-washed jeans with zippered pockets, and white high-topped tennis shoes. According to Dailey, the appellant stated that he wanted to purchase some crack cocaine. The two men went to an area known as Box Alley where the appellant purchased $50 of crack cocaine. Dailey stated that the appellant received three or four rocks of crack at that time. He testified that he and the appellant went to his house and smoked a rock of cocaine. *Page 1016 
At Dailey's suggestion, they then walked to the home of Leon Brown and LaVoris Scott. Dailey testified that Brown was at work, but Ms. Scott was home. He and the appellant went inside the house and the threesome smoked more of the appellant's crack cocaine.
Dailey stated that he left Ms. Scott's residence after approximately ten minutes and did not return for an hour and a half. According to Dailey, when he returned the appellant was not there. Dailey left a second time and returned approximately two hours later accompanied by Nancy Fletcher. When Dailey returned the second time, the appellant was at the Scott residence along with several other people, at least one of whom Dailey knew to be a drug dealer. Crack cocaine was being used when Dailey returned and he testified that he observed the appellant buying crack cocaine during the night. He stated that he saw the appellant purchase $300 worth of crack at one time. Dailey testified that he did not see anyone else purchasing cocaine that night. At this time, the appellant was wearing the same clothes that he had been wearing when Dailey met him at 6:30.
Dailey stated that, after he returned to Ms. Scott's residence the second time, he saw the appellant with currency in the denominations of twenties, tens, fives, and ones. According to Dailey, the appellant "was taking it out. He had it laid on the bed down in stacks like" and was "[a]rranging it or counting it." R. 1204. Dailey estimated the amount of cash he saw in the appellant's possession to have been $1,000 to $1,300.
According to Dailey, the appellant told those in the house that "[h]e wanted to go to Birmingham or Huntsville. He needed to get out of town." R. 1206. The appellant then left the house with Nancy Fletcher.
Dailey testified that he had initially given this information to the police while being questioned for a bad check. He stated that he had been indicted since making this statement, but that he had been offered no leniency in that case in return for his testimony in the present case and that he did not expect to receive any benefit from his present testimony.
On cross-examination Dailey agreed that he and the appellant reached Ms. Scott's residence around 7:00 p.m. and that he left the residence the first time around 7:10. He acknowledged that he had not been indicted in connection with the bad check for which he was being questioned when he gave the police the information concerning the appellant. He also acknowledged that he had been "arrested for forging one of Mr. Andrews' checks," R. 1222-23, and that he had been released on his own recognizance after he failed to appear in court and his relatives thereafter declined to continue to act as sureties for his bond.
LaVoris Scott testified that Dailey and the appellant came to her house "around 6:00, 6:30" on the night in question. R. 1233. She stated that the appellant was wearing a dark sweat shirt, stone-washed blue jeans, and white high-topped tennis shoes. The appellant had crack cocaine with him and the three of them smoked "about four or three" rocks. R. 1235. Dailey left after a short period of time and she and the appellant then smoked the last rock of cocaine. The appellant said that "he was going to get some more dope" and that he would return. R. 1236. Ms. Scott testified that the appellant then left and "was gone for a long time," that could have been an hour and a half. R. 1237. When the appellant returned, he was wearing the same clothes he had been wearing when he and Dailey arrived.
Ms. Scott stated that after the appellant returned to her house, she observed him with crack cocaine and a roll of currency, which he kept in his pocket. Ms. Scott testified that she saw "a lot of ones" and some twenties in this roll. R. 1240. The appellant used this money to purchase crack cocaine while at Ms. Scott's house. According to Ms. Scott, everyone in the house participated in smoking the cocaine. This party broke up when Ms. Scott's boyfriend, Leon Brown, came home from work, which was "around 10:30, something to 11:00 or 11:30." R. 1244. The appellant, *Page 1017 
who was "high," left with Nancy Fletcher. R. 1244-45. Ms. Scott stated that she did not hear the appellant "ask anyone to take him anywhere that night." R. 1245.
In response to questions posed by the trial court, Ms. Scott explained how crack cocaine is smoked. When asked "[w]hat sort of condition" the appellant was in "when he left the first time," Ms. Scott responded, "He was high." R. 1252. Although she "d[id]n't know how high he was" at that time, the appellant did not "have any difficulty walking around" and was "able to talk to [her]." R. 1252-53.
Nancy Fletcher, who stated that she was not related to the appellant, testified that, on the evening of March 1, 1991, she came to Athens from Huntsville to look for her boyfriend. While searching for her boyfriend, she made the acquaintance of Dailey and accompanied him to LaVoris Scott's house. Ms. Fletcher testified that the only people she remembered being present at Ms. Scott's house were Ms. Scott and the appellant, both of whom were smoking cocaine when Ms. Fletcher and Dailey arrived. Ms. Fletcher testified that she and Dailey joined in the use of the cocaine until "[t]hey ran out of drugs." R. 1261. Ms. Fletcher also stated that she had been drinking that night and that she had an alcohol problem. She acknowledged on cross-examination that she had given Dailey money to purchase drugs prior to going to Ms. Scott's house.
According to Ms. Fletcher, she remained at Ms. Scott's residence for 30 minutes or so. The appellant asked her to take him to Birmingham, saying that he had some relatives there. Ms. Fletcher agreed to take the appellant to Birmingham if he would buy some gas for her car. They left and when the defendant purchased the gas as agreed, Ms. Fletcher observed that he had some money, which she thought "was twenties." R. 1263.
Ms. Fletcher stated that she was "too high to drive to Birmingham at that time," and that she and the appellant went instead to Huntsville. R. 1263. When they reached Huntsville, the appellant bought some more crack cocaine, then they went to Ms. Fletcher's house where they spent the night. Ms. Fletcher testified that the next morning the appellant asked her to take him back to Athens, which she did. When she met the appellant at Ms. Scott's residence, and thereafter while he was in her company, the appellant was wearing light colored blue jeans and what she thought was a "sweat top." R. 1265.
The sole defense witness was Steve Pendergrass, a candy wholesaler who supplied candy to the victim's store. Pendergrass testified that he and his family passed the victim's store at approximately 8:00 p.m. on March 1 on their way home from a dinner outing. He observed the victim's vehicle parked outside the store. He then stated: "We did observe another vehicle in front of the store, but we saw — you know, we didn't see anybody or any activity although it was lit up enough that we would have thought perhaps that there might have been a customer inside." R. 1279. Pendergrass could describe the other car only as "a small car as opposed to being a large vehicle." R. 1280.
The principles governing our review of the sufficiency of circumstantial evidence are set out in detail in Ex parteMauricio, 523 So.2d 87, 91-93 (Ala. 1987), Dolvin v. State,391 So.2d 133, 137-38 (Ala. 1980), White v. State, 546 So.2d 1014,1016-18 (Ala.Cr.App. 1989), and Cumbo v. State, 368 So.2d 871,874-75 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), and need not be repeated here. Applying those principles, we find that, while the State's evidence clearly cannot be characterized as overwhelming and is, in fact, somewhat weak, it is at least minimally sufficient to support the appellant's conviction for intentional murder during a robbery.
The victim was bludgeoned to death in his own store. The manner in which he was killed suggested that the killer was under the influence of stimulating drugs. There was evidence that the cash register at the store had been moved from its usual position. The appellant's left palm print was found on the left side of the cash *Page 1018 
register, which is where one would expect to find the print of the person who moved the cash register. This palm print, which was found in a place where customers were not invited, but which was accessible to them, would not alone be sufficient to support the appellant's conviction. Ex parte Williams,468 So.2d 99, 102 (Ala. 1985). However, the State also introduced evidence that a black male wearing stone-washed jeans, a dark sweat shirt, and white high-topped tennis shoes was seen in the vicinity of the victim's store on the night of the robbery. State witnesses testified that the defendant was wearing similar clothing that night and that he was smoking crack cocaine. Additionally, the appellant, who had been paid only $50.54 that day, was seen with large amounts of cash on the night of the murder. This cash was in denominations of twenties, tens, fives, and ones, the same denominations taken from the victim's store.
There are also circumstances consistent with the appellant's innocence: the appellant was frequently in the victim's store and could have left the palm print on the register long before the murder occurred; the palm print lifted from the side of the cash register was not bloody, while there was a bloody print of some kind on the counter; there were three unidentified and unaccounted for people in the victim's store on the night of the murder; stone-washed jeans, a dark sweatshirt and white high-topped tennis shoes are commonly worn by any number of people; and none of the witnesses partying with the defendant on the night of the murder testified that there were bloodstains on the appellant's clothes when he returned to Ms. Scott's house. However, " '[i]t is not necessary for the circumstances to be "such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused." ' " White v. State, 546 So.2d at 1022 (quoting Mitchell v.State, 114 Ala. 1, 6, 22 So. 71, 72 (1897)).
" '[T]he standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt,but rather whether there was evidence from which the jury mightreasonably so conclude.' "
Ex parte Mauricio, 523 So.2d at 92 (emphasis added). Although weak, we find the State's evidence to have been sufficient for the jury to reasonably exclude every hypothesis but that of the appellant's guilt.
 II
The appellant contends that the trial court committed plain error in failing to instruct the jury on (1) voluntary intoxication and (2) manslaughter as a lesser included offense.
In denying the appellant's motion for judgment of acquittal made at the close of the State's case, the trial court stated:
 "At this point in time, I don't see any basis for any other lesser included charges[2] and I realize I haven't heard all the evidence and testimony, but to give you a guide as to where I'm coming from, I will ask one question, and I'm sure, of course, y'all realize my purpose in asking a question about this condition at the time they left [sic].
 "Voluntary intoxication is not a defense, but I would say that in the context of capital murder, you know, it would overcome the mental state with a paradox in the law [sic]. The nature and effect of intoxication or voluntary intoxication is a very problematical error [sic].
 "I asked a couple of very brief questions and my purpose for doing that was just to get an impression. I did not get the impression from the evidence that he was so intoxicated that he didn't know what he was doing."
R. 1274-75 (emphasis and footnote added). Defense counsel's reply to these comments was, "Judge, I believe that because of Your Honor allowing us to be so liberal and following so much of what has happened — " R. 1275. This was the only *Page 1019 
point during the trial at which intoxication was discussed. The possibility of manslaughter as a lesser included offense was never discussed. Defense counsel did not at any time during the trial request that the jury be instructed on voluntary intoxication or manslaughter or object to the court's failure to give such instructions.
Voluntary intoxication and manslaughter as a lesser included offense of intentional murder are interrelated and often overlapping subjects. "Voluntary drunkenness neither excuses nor palliates crime." Ray v. State, 257 Ala. 418, 421,59 So.2d 582, 584 (1952). "However, drunkenness due to liquor or drugs[3]
may render [a] defendant incapable of forming or entertaining a specific intent or some particular mental element that is essential to the crime." Commentary to Ala. Code 1975, §13A-3-2. Where the defendant is charged with a crime requiring specific intent and there is evidence of intoxication, " 'drunkenness, as affecting the mental state and condition of the accused, becomes a proper subject to be considered by the jury in deciding the question of intent.' " Silvey v. State,485 So.2d 790, 792 (Ala.Cr.App. 1986) (quoting Chatham v.State, 92 Ala. 47, 48, 9 So. 607 (1891)). Consequently, when the crime charged is intentional murder " 'and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter.' " McNeillv. State, 496 So.2d 108, 109 (Ala.Cr.App. 1986) (quoting Grayv. State, 482 So.2d 1318, 1319 (Ala.Cr.App. 1985)).
It is clear that "[a] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position." Ex parte Oliver,518 So.2d 705, 706 (Ala. 1987). This is true regardless of "however weak, insufficient, or doubtful in credibility" the evidence concerning that offense. Chavers v. State,361 So.2d 1106, 1107 (Ala. 1978). When there is evidence that would support a charge on a lesser included offense, the defendant is entitled to the charge "even where 'the defendant denies the charge,' Ex parte Pruitt, 457 So.2d 456, 457 (Ala. 1984), and [where] 'the evidence supporting the defendant's position is offered by the State.' Silvey v. State, 485 So.2d 790, 792
(Ala.Cr.App. 1986). Accord, Ex parte Stork, 475 So.2d 623, 624
(Ala. 1985)." Starks v. State, 594 So.2d 187, 195 (Ala.Cr.App. 1991).
A charge on intoxication should be given if " 'there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt' " on the element of intent.Coon v. State, 494 So.2d 184, 187 (Ala.Cr.App. 1986) (quotingGovernment of the Virgin Islands v. Carmona, 422 F.2d 95, 99 n. 6 (3d Cir. 1970)). See also People v. Perry, 61 N.Y.2d 849,473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App. 1984) ("[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis"). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting, Owen v. State, 611 So.2d 1126, 1128 (Ala.Cr.App. 1992); Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App. 1983), where the defendant denies the commission of the crime,Coon v. State, 494 So.2d at 187; see Moran v. State,34 Ala. App. 238, 240, 39 So.2d 419, 421, cert. denied, 252 Ala. 60, 39 So.2d 421 (1949), and where the evidence of intoxication is offered by the State, see Owen v. State,611 So.2d at 1127-28.
As can be seen from the foregoing, the rules governing the giving of instructions on intoxication and manslaughter as a lesser included offense of intentional murder are nearly identical. The courts of this state have been extremely liberal in applying those rules where evidence of intoxication is presented in a prosecution for intentional murder. See e.g.Owen v. State, 611 So.2d 1126, 1128 (Ala.Cr.App. *Page 1020 
1992) (where, in prosecution for capital offense of murder of a police officer, there was evidence that the defendant had consumed as many as eight beers in the two hours prior to the offense, trial court committed reversible error in refusing to instruct the jury on intoxication); Parker v. State,587 So.2d 1072, 1083, 1087 (Ala.Cr.App. 1991) (where, in prosecution for capital offense of murder for hire, there was evidence that the defendant had "shot up 3cc of Talwin," trial court instructed the jury on several lesser included offenses, including manslaughter), affirmed, 610 So.2d 1181 (Ala. 1992); Kuenzel v.State, 577 So.2d 474, 519, 522 (Ala.Cr.App. 1990) (where, in prosecution for capital offense of murder during a robbery, there was evidence that the defendant had been drinking beer and smoking marihuana prior to the crime, the trial court instructed the jury on intoxication and on the lesser included offenses of murder, felony murder, manslaughter, and robbery), affirmed, 577 So.2d 531 (Ala.), cert. denied, ___ U.S. ___,112 S.Ct. 242, 116 L.Ed.2d 197 (1991). In reversing two separate capital convictions where the trial court refused to instruct the jury on the lesser included offense of manslaughter, this Court has stated:
 "No matter how strongly the facts may suggest that appellant was not so intoxicated at the time he committed the offense that he was incapable of forming the necessary specific intent, the jury should have been instructed on manslaughter as a lesser included offense since there was a 'reasonable theory from the evidence which would support the position.' "
Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App. 1983) (capital offense of murder of two persons in a single transaction); applied in McNeill v. State, 496 So.2d 108, 109
(Ala.Cr.App. 1986) (capital offense of murder during a robbery).
As set out in detail in Part I, in this case, the State introduced evidence that the appellant began smoking crack cocaine around 6:00 or 6:30 p.m. on the night of the murder. Dailey testified that the appellant smoked at least one rock of crack cocaine with him prior to the time they walked to Ms. Scott's house. According to Ms. Scott, the appellant smoked "four or three" rocks of crack cocaine with her and Dailey. After Dailey left, she and the appellant smoked another rock of crack cocaine. Ms. Scott testified that the appellant was "high" when he left her house the first time.
Dr. Warner testified that the manner in which the victim was killed, which he characterized as "overkill," suggested that the killer "was either influenced by a drug, a stimulatingdrug, or there was a sexual component to the killing." He also stated that cocaine use made a person "aggressive" or "hyper" and indicated that cocaine use would alter a person's response to "hit[ting] someone over the head and see[ing] them fall." Infact, the prosecutor argued in his closing statement that theappellant was "high on crack cocaine" when he committed therobbery/murder. R. 1311.
We note that an appellate court in California has held that "[w]here the voluntary intoxication instruction is sought in a situation not involving alcohol, . . . it must be supported by evidence advising the manner in which ingestion of the nonalcoholic drug affects the mind of the user." People v. Cox,221 Cal.App.3d 980, 270 Cal.Rptr. 730, 735-36 (4th Dist. 1990) (defendant asserted on appeal that trial court should have sua sponte given intoxication instruction because there was evidence that he had used methamphetamine). However, we think the better view is that expressed by the New York Court of Appeals:
 "The evidence of intoxication sufficient to warrant [an intoxication] instruction . . . may include evidence that the defendant's mental capacity has been diminished by intoxicants, but it need not [do so] in all cases. The charge may also be warranted if the record contains evidence of the recent use of intoxicants of such nature or quantity to support the inference that their ingestion was sufficient to affect defendant's ability to form the necessary criminal intent." *Page 1021 
People v. Rodriguez, 76 N.Y.2d 918, 563 N.Y.S.2d 48, 49,564 N.E.2d 658, 659 (Ct.App. 1990) (intoxication instruction not warranted in that case because "[t]here was no evidence of when defendant ingested narcotics, the quantity ingested, or the effect they had on him" and because the record also showed that the defendant "made coherent statements both on the day of the crime and on the day of the arrest in which he described with particularity the events leading up to the crime") (emphasis added).
The intoxicant involved in this case was crack cocaine, a substance whose dangers and effects have been well publicized by the media. Applying the holding of People v. Rodriguez, we find that the evidence of intoxication in this case was sufficient to warrant a charge on intoxication. Compare UnitedStates v. Washington, 819 F.2d 221, 225 (9th Cir. 1987) (intoxication instruction not warranted where "[n]o one identified Washington as drinking or as appearing to be intoxicated before or at the time of the shootings"); Gray v.State, 482 So.2d 1318, 1319 (Ala.Cr.App. 1985) (instruction on manslaughter as a lesser included offense of intentional murder not warranted where "there [wa]s absolutely no evidence of intoxication") (emphasis added).
We recognize that "[t]he degree of intoxication necessary to negate specific intent . . . must amount to insanity." Ex parteBankhead, 585 So.2d 112, 121 (Ala. 1991). However, it is clear that where there is evidence of intoxication, the extent to which the accused is intoxicated is a question to be decided by the jury. Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App. 1983). See Ex parte Bankhead, 585 So.2d at 121; Chatham v.State, 92 Ala. at 49, 9 So. at 608; Owen v. State,611 So.2d at 1128; Anderson v. State, 507 So.2d 580, 584 (Ala.Cr.App. 1987). In determining that the appellant "was [not] so intoxicated that he didn't know what he was doing," the trial court in the instant case "invaded the exclusive province of the jury." Owenv. State, 611 So.2d at 1128.
Having concluded that a charge on intoxication was warranted, it follows that a charge on manslaughter as a lesser included offense was also warranted. See McNeill v. State,496 So.2d at 109; Crosslin v. State, 446 So.2d at 682. Under the evidence presented, the appellant would have been entitled to instructions on both intoxication and manslaughter as a lesser included offense had he requested those charges at trial.
Because there was no request for those charges at trial and no objection to the trial court's failure to give those charges, the appellant is entitled to reversal on this appeal only if the failure to give those charges is error " ' "so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." ' Ex parte Womack, 435 So.2d [766, 769 (Ala.), cert. denied, 464 U.S. 986
[104 S.Ct. 436, 78 L.Ed.2d 367] (1983)]." Russaw, 572 So.2d 1288, 1293
(Ala.Cr.App. 1990). See also Rule 45A, A.R.App.P.
Under the facts presented, the appellant was entitled to an instruction on the lesser included offense of felony murder and the trial court not only charged the jury on this lesser included offense, but did so accurately and completely. The court's instruction on the distinction between the capital offense of murder during a robbery, which requires a specific intent to kill, and felony murder, which does not require an intent to kill, was clear and concise. See generally Starks v.State, 594 So.2d at 193-95. Because the question of intent to kill is the sole and critical distinction between those two offenses, one of which carries a possible penalty of death and one which does not, there is an obvious and significant benefit to a defendant in having the jury instructed that it might consider his intoxication in deciding whether he had a specific intent to kill.[4] Cf. United States *Page 1022 v. Fay, 668 F.2d 375, 378 (8th Cir. 1981) ("we find that the trier of fact could reasonably have been influenced by the trial court's failure to give such an instruction [on intoxication]"). For this reason, we conclude that the failure of the trial court to instruct the jury on intoxication "has or probably has adversely affected the substantial right of the appellant," Rule 45A, A.R.App.P., and requires that the appellant's conviction be reversed.
Because we have determined that the failure to instruct the jury on intoxication was plain error, we need not address the question of whether the failure to give the manslaughter instruction was also plain error. We do observe, however, that "[i]t is much the safer rule to charge upon all the degrees of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree." Phelps v. State, 435 So.2d 158, 163
(Ala.Cr.App. 1983), quoted in Jones v. State, 514 So.2d 1060,1064 (Ala.Cr.App.), cert. denied, 514 So.2d 1068 (Ala. 1987). This is especially true "[i]n a capital case, [where] there is the intolerable and constitutionally prohibited risk of an unwarranted conviction that is created when the jury is deprived of the 'third option' of convicting the defendant of a lesser included offense." Connolly v. State, 500 So.2d 57, 67
(Ala.Cr.App. 1985), affirmed, 500 So.2d 68 (Ala. 1986).
 III
The appellant maintained at trial and argues on this appeal that the known palm print used to identify the latent print taken from the side of the cash register was obtained as the result of an illegal arrest and should have been suppressed.
At the hearing on the appellant's motion to suppress, it was established that, in March 1991, the appellant was serving on probation a sentence imposed by the Athens Municipal Court. As two of the conditions of his probation, the appellant had been ordered to pay court costs and restitution. See generally Ala. Code 1975, § 12-14-13(d)(7) and (8). The appellant did not meet these conditions of his probation and was arrested on an alias warrant in November 1990. He was ordered to pay weekly on the amounts due and was released. It is uncontested that he failed thereafter to make the ordered payments.
On March 18, 1991, Athens police investigator Tracy Harrison asked the Athens municipal court clerk/magistrate if there was "anything outstanding" on the appellant. R. 766. When the clerk/magistrate checked the appellant's file, she discovered that he had not made the court-ordered payments that were a condition of his probation. She immediately issued a capias warrant. The appellant was arrested on this capias warrant the next day and his finger and palm prints were taken. A motion to revoke the defendant's probation was filed April 4, 1991. The appellant subsequently "admit[ted] non-payment" and his probation was revoked. Ex.R. 30.
The appellant contends that his arrest on the capias warrant was illegal (1) because it was pretextual and (2) because the municipal court clerk/magistrate did not have the authority to issue the capias warrant for a probation violation.
The appellant's first contention must fail under this Court's holding in Scarbrough v. State, 621 So.2d 996 (Ala.Cr.App. 1992). In Scarbrough, we adopted the "objective" test set forth by the Fifth Circuit Court of Appeals with regard to determining the validity of an alleged pretextual arrest:
 " 'Again and again in precisely the present context, the [Supreme] Court has told us that where police officers are objectively doing what they are legally authorized to do — as in arresting [the defendant] pursuant to the valid warrant outstanding against him and interrogating him without coercion after reading him repeated Miranda warnings — the results of their investigations are not to be called in question on the basis of any *Page 1023 
subjective intent with which they acted. . . .
 " '. . . The relevant principle of the Supreme Court is likewise: so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry. . . . The correct rule is that, while a showing of objectively reasonable good faith on the part of the police officers will ordinarily redeem honest errors and prevent the application of the exclusionary rule, in a case where the officers have taken no action except what the law objectively allows[,] their subjective motives in doing so are not even relevant to the suppression inquiry. And the reason lies in the purpose of that rule: to deter unlawful actions by police. Where nothing has been done that is objectively unlawful, the exclusionary rule has no application and the intent with which they acted is of no consequence.'
". . . .
United States v. Causey, 834 F.2d 1179, 1184-85 (5th Cir. 1987) (emphasis in original) (footnotes omitted)." Scarbrough,621 So.2d at 1004. In this case, as in Scarbrough, "the police did no more than they were legally entitled to do." Id. at 1006. Investigator Harrison checked with the municipal clerk/magistrate to see if there were any outstanding warrants on the appellant. Although there were no outstanding warrants, it is clear that the appellant was in violation of his probation at that time. In fact the municipal clerk/magistrate testified that the capias warrant should have been issued "a long time ago." R. 766. Once the capias warrant was issued, the officers were authorized to take the appellant into custody on that warrant. After the appellant was in custody, his finger and palm prints were justifiably taken as part of the booking process. See 2 W. LaFave, Search and Seizure § 5.3(c) at 498 (2d ed. 1987). Consequently, we find that "[t]he conduct of the police was objectively reasonable." Scarbrough v. State,621 So.2d 996.
In support of his second contention, the appellant relies on Rule 18(I)(B)(2), A.R.Jud.Admin., which provides in pertinent part that "[t]he powers of a municipal court magistrate shall be limited to" six specifically enumerated acts, including the "[i]ssuance of arrest warrants for municipal ordinance violations." The appellant's interpretation of this rule is that it precludes a municipal court magistrate from issuing arrest warrants for violations of probation granted by the municipal court. However, it appears to this Court that the Rule 18(I)(B)(2)(a) limitation to municipal ordinance violations is merely intended to differentiate the magistrate's power from the power of the municipal judge.[5] By statute, municipal court judges have the authority to issue arrest warrants for both "municipal ordinance violations" and
"violations of state law." Ala. Code 1975, § 12-14-32. "Magistrates are 'vested with judicial power reasonably incident to the accomplishment of the purposes' for which the position of magistrate is created." Bahakel v. Tate,503 So.2d 837, 838 (Ala. 1987). It is "reasonably incident" to a magistrate's power to issue arrest warrants for municipal ordinance violations for that magistrate to also issue warrants for the arrest of municipal court probation violators.
We find that the appellant's arrest was not illegal on the grounds asserted.[6] *Page 1024 
For the reasons stated in Part II above, the appellant's conviction is reversed and this cause is remanded to the circuit court for further proceedings consistent with this opinion. Our decision not to address the remaining issues raised by the appellant should not be construed as an approval of the manner in which the trial was conducted in regard to those issues.
REVERSED AND REMANDED.
All Judges concur.
[1] Throughout her trial testimony, Ms. Prevost identified the latent print taken from the side of the register only as the appellant's palm print, without specifying whether it was his left or right palm print. However, her testimony was based on the known print in State's Exhibit 21, which had previously been identified by Sergeant Johnson as "the known left-hand
palm print of Mr. Fletcher" taken by Johnson on March 20, 1991. R. 1024 (emphasis added). Further, defense counsel introduced into evidence a copy of Ms. Prevost's written report which contains the statement "[o]ne (1) palm print of value found on lift marked Lat. # 1 — IDENTIFIED AS THE LEFT PALM PRINT OF MARCUS FLETCHER." R. 1072; Defendant's Ex. 7, Ex. R. 35 (emphasis added).
[2] The trial judge had previously stated that he intended to charge on the lesser included offenses of robbery and murder. R. 1271.
[3] "The law concerning drug intoxication is the same as for alcohol intoxication. See Commentary, § 13A-3-2, Code of Alabama 1975." Hooks v. State, 534 So.2d 329, 352 (Ala.Cr.App. 1987), affirmed, 534 So.2d 371 (Ala. 1988), cert. denied,488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989).
[4] We note that the current pattern jury instruction on intoxication reads: "Intoxication of the defendant, whether voluntary or involuntary, may be considered by the jury whenever it is relevant to negate an element of the offense charged, such as 'intent.' " 1 Alabama Pattern Jury Instructions — Criminal 3-4 (ABICLE 1989 rev.) See also Alabama Pattern Jury Instructions — Criminal IIID-9 (ABICLE 1980).
[5] We note that Ala. Code 1975, § 12-14-51(c)(1) simply provides that one of the powers of the municipal court magistrate is the "[i]ssuance of arrest warrants."
[6] We note that Rule 27.4(a), A.R.Crim.P., provides that probation revocation proceedings may be initiated by either a motion to revoke probation filed by the prosecutor or probation officer or a show cause order entered by the sentencing court. "Pursuant to a petition to revoke or an order to show cause, the sentencing court may issue a warrant for the probationer's arrest." Rule 27.4(b), A.R.Crim.P. This procedure was clearly not complied with in the instant case. While this matter was mentioned briefly by defense counsel at the motion to suppress, it was not argued on appeal and we therefore make no determination with regard to that particular aspect of the appellant's arrest. *Page 1221