On the morning of December 31, 1989, the body of Sarah Brown was found in a field in Evergreen, Alabama. She had been stabbed 67 times. The appellant, Jimmy Lavon Stanton, was convicted of her murder and was sentenced as a habitual felony offender to imprisonment for life without parole. He raises five issues in this direct appeal from his conviction.
 I
The appellant states his first argument as follows: "The [appellant] was denied equal protection of the law in that the State exercised peremptory challenges to remove from the venire members of the [appellant's] race." Appellant's brief at 9. The appellant claims both that the State exercised its peremptory challenges in violation of Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and that his Sixth Amendment rights were violated "in that blacks were under-represented on the jury panel," Appellant's brief at 10. These are clearly two separate issues. See Holland v. Illinois, 493 U.S. 474,110 S.Ct. 803, 107 L.Ed.2d 905 (1990); DeFries v. State,597 So.2d 742, 750 (Ala.Cr.App. 1992); Brundage v. State, 585 So.2d 238,239 (Ala.Cr.App. 1991).
No Batson objection was made at any time in the trial court. Consequently, that particular claim was not preserved for this *Page 640 
Court's review. See Bell v. State, 535 So.2d 210, 212 (Ala. 1988) ("in order to preserve the issue for appellate review, aBatson objection, in a case in which the death penalty has not been imposed, must be made prior to the jury's being sworn") (emphasis added), quoted in, e.g., Ross v. State,581 So.2d 495, 496 (Ala. 1991); Jordan v. State, 607 So.2d 333, 334
(Ala.Cr.App. 1992); Fearn v. City of Huntsville, 568 So.2d 349,351 (Ala.Cr.App. 1990).
With regard to his Sixth Amendment claim, the appellant "contends that the trial court erred when it ruled that the appellant failed to prove a prima facie case of racial discrimination in that blacks were under-represented on the jury panel because the proportionate number of blacks on the panel was significantly less than their percentage of population composition in Conecuh County." Appellant's brief at 10.
After the voir dire of the venire panel, the trial court granted three challenges for cause, leaving a panel of 44 veniremembers, 9 of whom were black, from which to strike the jury. Defense counsel objected to the venire panel on the basis of its racial composition and moved for a continuance, asserting that the appellant could not obtain a jury that was representative of a cross-section of the community.
In denying the motion for a continuance, the trial court took judicial notice that prospective jurors in Conecuh County are "randomly select[ed]" by computer from those Conecuh County residents "holding driver's license[s] and identity cards." R. 97-98.[1] Although noting that blacks constitute "about 37, 38% of the [jury] eligible population in Conecuh County," and that "[t]his jury panel, as it ends up on the strike list after challenges for cause, is composed of 20% black and 80% white," the court specifically found "nothing wrong with the selection procedure." R. 98-99. This finding was correct. "Random selection from a list of licensed drivers has been held to be an acceptable manner in which to select a jury. See Stewart v.State, 623 So.2d 413[, 415] (Ala.Cr.App. 1993); Joyce v. State,605 So.2d 1243, 1245 (Ala.Cr.App. 1992)." Sistrunk v. State,630 So.2d 147, 149 (Ala.Cr.App. 1993).
As the appellant correctly recognizes, in order to establish a prima facie violation of the Sixth Amendment fair cross-section requirement, a defendant must show the following:
 "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."
Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668,58 L.Ed.2d 579 (1979). Even if we assume that the appellant has established the first two of the three Duren elements, it is clear that he has failed to establish the third element.
"The third Duren element — that there has been a systematic exclusion of a distinctive group — constrains a defendant to establish that 'the cause of the underrepresentation was . . . inherent in the particular jury-selection process utilized.'Duren, 439 U.S. at 366, 99 S.Ct. at 669." Sistrunk v. State, 630 So.2d at 149. Additionally, "with regard to the second and third Duren elements, a defendant asserting a fair cross-section violation 'must demonstrate . . . not only that [blacks] were not adequately represented on his jury venire, but also that this was the general practice in other venires.'Timmel v. Phillips, 799 F.2d 1083, 1086 (5th Cir. 1986)."Sistrunk v. State, 630 So.2d at 150. In this case, there was absolutely no *Page 641 
showing either that random computerized selection of licensed drivers inherently results in underrepresentation of blacks on jury venires in Conecuh County or that blacks had been underrepresented on other venires in Conecuh County. In fact, defense counsel acknowledged just the opposite:
 "I recognize that this is all done in Montgomery and I would assume that I could call it just one of those flukes . . . [be]cause it is not like most of the juries that come out. Most of the juries have more blacks. And it's certainly nothing that you've done. Our point is that this jury list was tainted when it arrived in the clerk's office. . . . It was just deficient from day one, for whatever reason."
R. 96-97 (emphasis added). Neither "mere coincidence" nor " 'accidental' exclusion" is sufficient to establish the thirdDuren element of systematic exclusion. See United States v.Guy, 924 F.2d 702, 706 (7th Cir. 1991); Alschuler, The SupremeCourt and the Jury: Voir Dire, Peremptory Challenges, and theReview of Jury Verdicts, 56 U.Chi. L.Rev. 153, 184-85 (1989). "In the absence of a showing of systematic exclusion, the showing of a disparity between the percentage of blacks in the population of the county in which venue is situated and the percentage of blacks on the venire does not establish a violation of the fair cross-section requirement." Stewart v.State, 623 So.2d at 415. The appellant's motion for a continuance was properly denied.
 II
There was no error in the admission of a videotape of the crime scene which showed the victim's body.
Investigator Johnny Blackmon of the Conecuh County Sheriffs Department testified that on the morning of December 31, 1989, he was dispatched to a field near the Evergreen airport, where he found the body of a young woman. It had rained during the night and the body was "[lying] out in the edge of the field, partially covered with mud." R. 139. Blackmon said that when other law enforcement officers arrived, they "did a crime scene investigation, which consisted of photographs, video, diagram of objects and evidence that we found on the scene." R. 128. He stated that several items — a pair of white pantyhose, two shoes, a gum wrapper, and a beer bottle — were recovered at the scene, and he testified as to various measurements regarding the location of these items. The jury was shown a videotape depicting law enforcement officers measuring the distances between the various items of evidence and concluding with a brief shot of the victim's body.
Before the video was shown to the jury, Investigator Blackmon testified that he "took a video of the crime scene" and that the videotape identified as State's Exhibit 6 "accurately portray[ed] and depict[ed] the crime scene as [he] saw it on the morning of December the 31st, 1989." R. 141. When a question arose as to whether State's Exhibit 6 was the original videotape taken by Blackmon or a copy thereof, the trial court excused the jury and had Blackmon watch the tape. After viewing the videotape, the court stated that the tape would be stopped at counter mark 200 when it was shown to the jury. The court then questioned Blackmon to ascertain that the videotape "accurately represent[ed] the things [Blackmon] saw out there at the scene when [he] took the videotape"; that the tape was not "distorted in any way"; that nothing had "been left out" of the tape; and that the tape had not "been edited." R. 151. The videotape was clearly admissible as a " 'pictorial communication.' " See generally Ex parte Fuller, 620 So.2d 675
(Ala. 1993).
The appellant contends that the videotape should not have been admitted because it was prejudicial and cumulative of other photographic evidence. We have viewed both the videotape and the five photographs offered by the State. As noted above, the videotape primarily shows law enforcement officers making various measurements and, when stopped at counter mark 200, ends with a brief shot of the victim's body. Three of the photographs offered by the State are of the victim. Two depict the body of the victim lying in a muddy field; the other is an identification photograph taken before the autopsy and shows only the victim's face. *Page 642 
The remaining two photographs show pantyhose and shoes in a muddy field.
Neither the videotape nor the photographs are particularly gory or gruesome. The victim was clothed when found and much of the blood from her 67 stab wounds had apparently been washed away by the rain. In any event, "[t]he fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried." Ex parteBankhead, 585 So.2d 112, 118 (Ala. 1991) (citing Magwood v.State, 494 So.2d 124 (Ala.Cr.App. 1985), affirmed,494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599,93 L.Ed.2d 599 (1986)). "Photographs are admissible if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered. Baldwin v. State, 282 Ala. 653, 213 So.2d 819
(1968)." Ex parte Bankhead, 585 So.2d at 118. Furthermore, "photographic exhibits are admissible even though they may be cumulative [or] demonstrative of undisputed facts." Hopkins v.State, 429 So.2d 1146, 1157 (Ala.Cr.App. 1983). In this case, the videotape of the crime scene corroborated the testimony of Investigator Blackmon and was properly admitted. See generallyEx parte Siebert, 555 So.2d 780, 783-84 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990).
 III
The appellant contends that the trial court erred in denying his motion for a mistrial made after a State's witness had twice referred to the fact that the appellant had been in prison.
While the prosecutor was questioning Odell Claiborne about incriminating statements allegedly made by the appellant to Claiborne after the murder, the following occurred:
 "Q. All right. Did you have any other conversation with the Defendant, Jimmy Stanton, about the incident at the airport since then?
"A. Yes, sir.
"Q. And where was that?
 "A. Okay. We was at the Club that night and we had another conversation. And, so, I got away from around him. I didn't want to hear — we talking [sic] about the same thing. Then when he went to prison, he came and told me, said —
 "[Defense counsel]: Judge, I'm going to object. I move to exclude that.
 "THE COURT: Sustain. The jury shall not consider the last remark made by the witness.
 "[Defense counsel]: Move in limine to instruct the witness not to refer —
"THE COURT: All right.
"[Defense counsel]: And the State.
 "THE COURT: I'll instruct the witness not to refer to that — any whereabouts of Jimmy Stanton in any place other than Evergreen.
 "Q. (By [prosecutor]:) Did you later have another conversation with him some months later?
"A. Yes, sir.
". . . .
 "Q. And tell us about that conversation. "A. Okay. He came up, he had been — not been too long released from prison — "[Defense counsel]: Judge, I'll have to move for a mistrial.
 "THE COURT: Ladies and gentlemen of the jury, this witness has referred to the Defendant going to prison. I'd like to explain to you very carefully that the only thing that this Defendant can be charged with is the charge contained in the indictment. The fact that he may or may not have been at a prison has no bearing whatsoever on this case, [and] should not affect your decision in this case in any regard whatsoever. And I instruct you to disregard that fact and not to consider it whatsoever. It is not a fact in the case and you should remove it from your consideration. "I instruct the witness not to make reference to that again." R. 212-15 (emphasis added).
Claiborne testified on the afternoon of the first day of the appellant's trial. One other witness testified before the trial recessed for the night. The trial did not resume until *Page 643 
1:00 p.m. the next day. At that time, defense counsel renewed the motion for a mistrial on the basis that Claiborne's "inject[ion of] the incarcerations of [the appellant]" had denied the appellant a fair trial and had "indirectly violat[ed] his Fifth Amendment right to remain silent." R. 328. The trial judge denied the renewed motion, stating:
 "Well, I don't feel like the witness was all that intelligent and probably did not understand exactly what the court was instructing him to do because the court didn't want to use the word 'prison' in front of the jury to instruct him. Of course, the court did what it could once it came out the second time and only time and told the jury not to consider it. It wasn't a part of the trial. And I'd be happy to instruct the jury any further if you require it." R. 328-29.
Defense counsel excepted to the trial court's denial of the motion and declined the court's offer to give further curative instructions "because of the time that has lapsed since [the court's] curative instruction was given. We feel like that the time has caused the atmosphere of prejudice to be so overwhelming that there's no charge . . . this judge could give to the jury that would cure the highly prejudicial manner and the [un]constitutional deprivation of this man's rights." R. 329-30.
"[A] mistrial 'specifies such fundamental error in a trial as to vitiate the result,' Diamond v. State, 363 So.2d 109, 112
(Ala.Cr.App. 1978), and should be granted only when a 'high degree of "manifest necessity" ' is demonstrated, Wadsworth v.State, 439 So.2d 790, 792 (Ala.Cr.App. 1983), cert. denied,466 U.S. 930, 104 S.Ct. 1716, 80 L.Ed.2d 188 (1984)." Garnett v.State, 555 So.2d 1153, 1155 (Ala.Cr.App. 1989). " 'A motion for [a] mistrial should not be granted where the prejudicial qualities of the comment can be eradicated by action of the trial court.' " Cole v. State, 548 So.2d 1093, 1095
(Ala.Cr.App. 1989) (quoting Henry v. State, 468 So.2d 896, 901
(Ala.Cr.App. 1984), cert. denied, 468 So.2d 902 (Ala. 1985), and Nix v. State, 370 So.2d 1115, 1117 (Ala.Cr.App.), cert. denied, 370 So.2d 1119 (Ala. 1979)). Accord Covington v. State,620 So.2d 122, 127-28 (Ala.Cr.App. 1993). We find that Claiborne's references to the appellant's having been in prison, which were clearly unresponsive to the questions posed, are comparable to remarks that we have held can be eradicated by curative instructions. See, e.g., Bowers v. State,629 So.2d 793, 794 (Ala.Cr.App. 1993) (where "trial court, of its own volition, instructed the jurors to disregard [police detective's unresponsive answer that he 'under]stood the defendant] was facing charges in Milwaukee'] and questioned jurors to ensure that they could disregard the statement," the trial court's actions "cured any possible error"); Garnett v.State, 555 So.2d at 1155 ("any prejudice arising from [prosecutor's] question [indicating that murder defendant had been arrested for beating his wife] . . . was both capable of eradication and was eradicated by the trial court's prompt action" in instructing the jurors to disregard the question and in polling the jurors to ascertain that they could disregard the question); Floyd v. State, 412 So.2d 826, 830 (Ala.Cr.App. 1981) ("the trial court's action in immediately instructing the jury to disregard the prosecution's vague reference to another unspecified crime cured any potential error prejudicing the appellant's case").
In this case, after Claiborne's first reference to the appellant's having been in prison, the trial court sustained the appellant's objection, instructed the jury to disregard the witness's last remark, and instructed the witness not to make any other such remarks. When the witness again referred to the appellant's imprisonment, the trial court clearly and forcefully instructed the jury that it was to disregard Claiborne's references to the appellant's having been in prison. We also note that the trial court offered to give further curative instructions when defense counsel renewed the motion for a mistrial but that this offer was declined by defense counsel.
Contrary to defense counsel's assertion at the time the trial court denied the renewed motion for a mistrial, the trial court's curative instruction given during Claiborne's testimony was sufficient to eradicate any prejudice resulting from Claiborne's unresponsive answer. "Where, as in this case, improper remarks are capable of eradication and the *Page 644 
'trial court acts promptly to impress upon the jury that improper [remarks] are to be disregarded by them in their deliberations, the prejudicial effects of such remarks are removed.' Woods v. State, 460 So.2d 291, 295 (Ala.Cr.App. 1984)." Register v. State, 640 So.2d 3, 11 (Ala.Cr.App. 1993), affirmed, 640 So.2d 12 (Ala. 1994). Moreover, "a motion [for a mistrial] is addressed to the sound discretion of the trial court, and its ruling will not be reversed in the absence of a clear showing of abuse of discretion." Ex parte Jefferson,473 So.2d 1110, 1114 (Ala. 1985), cert. denied, 479 U.S. 922,107 S.Ct. 328, 93 L.Ed.2d 300 (1986). There has been no showing of an abuse of discretion in this case.
 IV
The appellant, who was charged with intentional murder, requested that the jury be instructed on intoxication and on manslaughter as a lesser included offense. The trial court refused to give his requested written charges on these matters. Relying on Fletcher v. State, 621 So.2d 1010 (Ala.Cr.App. 1993), the appellant asserts that the trial court's refusal to give these charges was reversible error.
In Fletcher, this Court thoroughly reviewed the law concerning instructions on intoxication and manslaughter in cases where the defendant is charged with intentional murder. We began our review with the following summary of the general principles:
 "Voluntary intoxication and manslaughter as a lesser included offense of intentional murder are interrelated and often overlapping subjects. 'Voluntary drunkenness neither excuses nor palliates crime.' Ray v. State, 257 Ala. 418, 421, 59 So.2d 582, 584 (1952). 'However, drunkenness due to liquor or drugs may render [a] defendant incapable of forming or entertaining a specific intent or some particular mental element that is essential to the crime.' Commentary to Ala. Code 1975, § 13A-3-2. Where the defendant is charged with a crime requiring specific intent and there is evidence of intoxication, ' "drunkenness, as affecting the mental state and condition of the accused, becomes a proper subject to be considered by the jury in deciding the question of intent." ' Silvey v. State, 485 So.2d 790, 792 (Ala.Cr.App. 1986) (quoting Chatham v. State, 92 Ala. 47, 48, 9 So. 607 (1891)). Consequently, when the crime charged is intentional murder ' "and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter." ' McNeill v. State, 496 So.2d 108, 109 (Ala.Cr.App. 1986) (quoting Gray v. State, 482 So.2d 1318, 1319 (Ala.Cr.App. 1985))."
Fletcher, 621 So.2d at 1019 (some emphasis original; other emphasis added; footnote omitted). Thus, at the outset of our discussion in Fletcher we made it very clear that there must be some evidence of intoxication presented before a defendant is entitled to a charge on intoxication or manslaughter as a lesser included offense of intentional murder. This was not a new pronouncement in Fletcher; numerous other Alabama cases have enunciated that same principle. E.g., Ray v. State,257 Ala. 418, 421, 59 So.2d 582, 584 (1952) ("in murder casesevidence of drunkenness to such degree that the accused is incapable of rational action and hence incapable of forming a specific intent essential to [an intentional] killing may reduce the killing to manslaughter, or may negative the [intent] essential to murder") (emphasis added); Owen v. State,611 So.2d 1126, 1128 (Ala.Cr.App. 1992) ("[w]hen there isevidence of intoxication and the crime charged requires a specific intent, an instruction on the effects of intoxication and how it relates to any lesser included offense should be given") (emphasis added); McNeill v. State, 496 So.2d 108, 109
(Ala.Cr.App. 1986) (" '[w]hen the crime charged involves a specific intent, such as murder, and there is evidence ofintoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter' ") (emphasis added) (quoting Gray v. State, 482 So.2d 1318, 1319 (Ala.Cr.App. 1985)), quoted in Fletcher, 621 So.2d at 1019.
In this case, there simply was no evidence of intoxication.
The appellant did not testify at trial.[2] State's witness Odell *Page 645 
Claiborne was the only witness who provided direct evidence concerning the events that occurred on the night of December 30, 1989. Claiborne testified that he joined the appellant and three other young men around 10:30 or 11:00 p.m. that night. He stated that he bought beer at a gas station in Evergreen, and that the group then drove to Georgiana, where he, the appellant, and one of the other young men went into a bar.[3]
According to Claiborne, the appellant danced with a young woman named Sarah while they were at the bar, and, when they left the bar around 2:30 or 3:00 a.m., Sarah left with them. Claiborne stated that they stopped at the football field in Georgiana and that he observed the appellant having sex with Sarah. The group, including Sarah, then left Georgiana and returned to Evergreen. Claiborne testified that they all went to a field near the Evergreen airport, that everyone but him got out of the car, and that he stayed in the car and slept. According to Claiborne, the four other young men later returned to the car without Sarah and they then left the field. Sarah Brown's body was found in this field the next day. She had been stabbed 67 times. The mother of Rico Lane, one of the young men who was with Claiborne and the appellant on the night of the murder, testified that, several days after the murder, the appellant told her that he, her son Rico, and two other individuals had "d[one] it," and that they had "passed the knife around." R. 337, 339.
During cross-examination of Claiborne, defense counsel established that the appellant had drunk beer and liquor on the night of the murder. However, Claiborne stated that he "ha[d] no idea" whether the appellant and the others had been drinking before he joined them. R. 235. Although Claiborne testified that he was "paying the tab for everybody" at the bar in Georgiana, R. 238, that he bought "at least three pints of whiskey" there, R. 239, and that he "let [the appellant] have as much [liquor] as he wanted," R. 240, he refused to estimate how much of the beer and liquor the appellant drank.
 "Q. Out of those pints of liquor, how much liquor would you say that Jimmy Stanton drank?
 "A. I couldn't probably — I couldn't say because I didn't watch him the whole time.
"Q. Well, just give us your judgment.
 "A. My judgment is not — not accurate. I don't know.
"Q. Okay. How much — was he drinking beer, too?
"A. Yes, sir.
"Q. Was he drinking a lot of beer?
"A. I don't recall."
R. 240. Claiborne stated that he was intoxicated when the group left Georgiana but did not testify as to the appellant's condition. We also note that Claiborne testified that the appellant was driving the vehicle in which the group drove to and returned from Georgiana and that there was no indication that the appellant's driving was erratic or otherwise impaired.
Merely showing that a defendant has been drinking before the commission of a crime, without showing the amount of alcohol consumed or its effect on the defendant, is not sufficient evidence of intoxication to entitle a defendant to an intoxication charge. See Hutcherson v. State, [Ms. CR 92-925, May 27, 1994] ___ So.2d ___, ___ (Ala.Cr.App. 1994); Garrick v.State, 589 So.2d 760, 764 (Ala.Cr.App. 1991). Compare, e.g.,Fletcher v. State, 621 So.2d at 1020 (defendant entitled to intoxication and manslaughter instructions where evidence showed that defendant had smoked five to six rocks of crack cocaine before the murder; one witness stated that defendant "was 'high' "; and the pathologist testified "that the manner in which the victim was killed, which he characterized as 'overkill,' suggested that the' killer 'was either influencedby a drug, a stimulating drug, or there was a sexual component to the killing' " *Page 646 
and that "cocaine use made a person 'aggressive' or 'hyper' ") (emphasis in original); Owen v. State, 611 So.2d at 1128 (defendant entitled to intoxication instruction where there was evidence that defendant "had consumed as many as eight beers within a two-hour period" before the murder); Silvey v. State,485 So.2d 790, 791 (Ala.Cr.App. 1986) (defendant entitled to manslaughter instruction where officer who arrested defendant shortly after murder "conveyed his opinion that [defendant] appeared intoxicated at th[at] time" and there was evidence that defendant "had been drinking all day and 'had had a lots to drink' "). Cf. Brown v. State, 627 So.2d 1112, 1113
(Ala.Cr.App. 1993) (defendant claiming self-defense entitled to instruction on victim's intoxication where "[t]here was evidence that the victim was taking cocaine and that he had been drinking heavily when the killing occurred," and testimony of "a police officer indicated that a person who takes cocaine and drinks alcohol at the same time may become belligerent and violent"). In view of the evidence in this case, which showed only that the appellant had drunk an unspecified amount of alcohol before the murder, there was no error in the trial court's refusal to give the requested charges on intoxication and on manslaughter as a lesser included offense of intentional murder.
 V
At sentencing, the State submitted proof that the appellant had three prior felony convictions — a 1986 conviction for third degree burglary, a 1989 conviction for burglary of an automobile, and a 1989 conviction for third degree burglary. The appellant objected to the use of the two 1989 convictions for enhancement purposes, arguing that they should not be considered because he had not been sentenced for those offenses at the time of the murder at issue in this case. The trial court overruled this objection and sentenced the appellant to life imprisonment without parole as a habitual felony offender with three prior convictions. See Ala. Code 1975, §§ 13A-6-2(c);13A-5-9(c)(3).
The instant offense occurred in late December 1989. The appellant had entered guilty pleas to the 1989 burglary charges in May 1989, but was not sentenced for those offenses until January 30, 1990. As the appellant concedes in his brief, the issue he raises was decided adversely to him in Congo v. State,477 So.2d 511, 516 (Ala.Cr.App. 1985):
 "Under the Habitual Felony Offender Act, the trial court must invoke its provisions in 'all cases when it is shown that a criminal defendant has been previously convicted of any [felony or] felonies and after such conviction[(s)] has committed another felony.' § 13A-5-9[(a), (b), (c)], Code of Alabama (1975). Appellant argues that where a defendant enters a plea of guilty, but has not been sentenced, and then commits another felony, that no 'conviction' exists which can then be used against him for sentence enhancement purposes. In the present case, evidence was introduced at the sentencing hearing which indicated that the appellant had entered guilty pleas to two felony offenses, and, seven days later, before the trial court had sentenced him, committed the present offense.
 "As this Court has noted, a 'plea of guilty is a conviction itself.' Jones v. State, 431 So.2d 1367, 1372 (Ala.Cr.App. 1983). Thus, it would appear to be proper, in the present case, to invoke the provisions of the Act. Appellant, however, argues that the two felony offenses to which he had pleaded guilty were not 'final' at the time he committed the present offense, since sentence had not been entered. It is apparent that appellant's argument is an attempt to interpolate the word 'final' into the provisions of the Alabama Habitual Felony Offender Act. Based upon the plain wording of the statute, however, such a position is without merit."
See also Summerhill v. State, 436 So.2d 2, 5 (Ala.Cr.App. 1983); Burgess v. State, 412 So.2d 298, 299 (Ala.Cr.App. 1982);Watson v. State, 392 So.2d 1274, 1279 (Ala.Cr.App.), cert. denied, 392 So.2d 1280 (Ala. 1981).
Although conceding that the cases construing the Habitual Felony Offender Act (HFOA) are against him, the appellant asserts that these cases conflict with Carroll v. State,599 So.2d 1253 (Ala.Cr.App. 1992), affirmed, *Page 647 627 So.2d 874 (Ala. 1993), cert. denied, ___ U.S. ___,114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). At issue inCarroll was the term "conviction" as used in Ala. Code 1975, §13A-5-40(a)(13), which defines the capital offense of "[m]urder by a defendant who has been convicted of any other murder in the 20 years preceding the crime." We held that "the term 'conviction' as used in Ala. Code 1975, § 13A-5-40(a)(13), means that there must have been a prior 'judgment' and 'sentence' and 'determination of guilt' as those terms are defined by Rule 26.1(a)(1), (2), and (3), A.R.Crim.P." Carroll, 599 So.2d at 1266. In reaching that conclusion, however, we observed that "[t]he meaning of the term ' "conviction" varies according to the context in which it appears and the purpose to which it relates.' " Id. at 1262. We also acknowledged that there were other situations in which, under Alabama law, the term "conviction" requires only an adjudication of guilt. Id. at 1265-66. We specifically noted that one of those situations involves the application of the HFOA. Id. at 1266. See also Exparte Alabama State Bar, 285 Ala. 191, 197, 230 So.2d 519, 525
(1970) ("jury verdict finding the defendant guilty and the judgment of conviction entered thereon by the [trial court] constitutes a conviction" for purposes of attorney disbarment proceeding); Evers v. Medical Licensure Comm'n, 421 So.2d 89,91 (Ala. 1982) ("a jury verdict finding a defendant guilty and the judgment of conviction entered thereon constitute a 'conviction' " for purposes of medical license revocation proceeding).
Furthermore, our conclusion in Carroll was grounded, in part, on "the requirement that criminal statutes must be construed so as to give fair warning of the nature of the conduct proscribed
and not broadened by judicial interpretation." Carroll, 599 So.2d at 1266 (emphasis added). See generally Kolender v.Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903
(1983) (in order to pass constitutional muster, a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement") (citations omitted); Smith v.Goguen, 415 U.S. 566, 574, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605
(1974) ("[d]ue process requires that all 'be informed as to what the State commands or forbids,' and that 'men of common intelligence' not be forced to guess at the meaning of the criminal law") (citations omitted). In contrast to §13A-5-40(a)(13), which defines criminal conduct, the HFOA merely sets forth the punishment for certain criminal conduct.
Inasmuch as different considerations are involved inCarroll than in Congo and the line of cases Congo followed, we find no conflict in the holdings of those cases. There was no error in the trial court's consideration of the appellant's two 1989 convictions, despite the fact that he was not sentenced for those convictions until after the commission of the instant offense.
For the reasons stated above, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] The court explained the process as follows:
 "The court notes that the jury selection procedure used in the Circuit Court of Conecuh County is . . . what is commonly referred to as a one-step procedure, whereby the names of all persons holding driver's license[s] and identity cards in the records of the Department of Public Safety are periodically collected by the Administrative Office of Courts and placed into their computer. The court tells the clerk that we need so many jurors for a term. The clerk communicates the number of jurors to be summonsed to the Administrative Office of Courts. The Administrative Office of Courts then uses their computers to randomly select a jury panel." R. 97-98.
[2] At the hearing on his motion for a new trial, which was held over eight months after the trial, the appellant testified that he was intoxicated on the night of the murder, having drunk large quantities of liquor and beer in addition to having used marijuana and cocaine. Because that testimony was not presented to the jury, however, it clearly cannot be considered by this Court in determining whether the appellant was entitled to jury instructions on intoxication and manslaughter.
[3] According to Claiborne, the other two young men were underage and waited in the car.