[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
JANUARY 5, 2012
JOHN LEY

_____

No. 09-15310

_____

D. C. Docket No. 06-01209-CV-LSC-PWG

GREGORY HUNT,

Petitioner-Appellant,

versus

COMMISSIONER, ALABAMA
DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(January 5, 2012)

Before DUBINA, Chief Judge, and TJOFLAT and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Gregory Hunt is a death-row inmate in the Alabama prison system as a result of his conviction for capital murder on June 19, 1990. Hunt seeks a writ of habeas corpus on the ground that he received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution. To obtain the writ, Hunt must establish that the decision of the Alabama Court of Criminal Appeals rejecting his claims "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The district court, concluding that Hunt had established neither point, denied the writ. After reviewing the record and considering the parties' arguments, we affirm.

## I.

## A.

On March 27, 1989, a Walker County, Alabama, grand jury returned an indictment charging Hunt with three counts of capital murder: intentional murder during the sexual abuse of a victim incapable of consent, intentional murder during sexual abuse by forcible compulsion, and intentional murder during a burglary.[1] In

---

[1] Counts I and II were brought under Alabama Code § 13A-5-40(a)(8), which designates as a capital offense "[m]urder by the defendant during sexual abuse in the first or second degree

June 1990, Hunt went to trial in the Walker County Circuit Court. Through the testimony of several witnesses the State presented in its case in chief, the jury heard the following.

Hunt had been dating the victim, Karen Lane, for about one month before her death on Tuesday, August 2, 1988. At the time, Lane was living with Tina Gilliland, Hunt's cousin, in Gilliland's apartment at 105 Elliott Heights, Cordova, Alabama. Hunt was with Lane at the apartment in the afternoon on Monday, August 1, when Gilliland's ex-husband arrived with his fiancée, Shirley Romine, to pick up his and Gilliland's two children. Gilliland was taking a nap at the time.

According to Romine, after Lane left the room where they had gathered, Hunt voiced frustration with Lane. He said that "he was tired of everything and that he was moving back to Miami, Florida." He also said, "She makes me so mad I could kill that [b]itch."

When Gilliland awoke, at about 6 p.m., Hunt was gone.[2] Shortly after 6 p.m., Gilliland and Lane left in Gilliland's beige 1986 Yugo. After stopping to buy cigarettes, they went to the residence of Gilliland's then-fiancé, Clinton Cook, in

---

or an attempt thereof committed by the defendant." Count III was brought under § 13A-5-40(a)(4), which designates as a capital offense "[m]urder by the defendant during a burglary in the first or second degree or an attempt thereof committed by the defendant."

[2] Gilliland testified that she did not see Hunt in her apartment that evening.

Parrish, Alabama.[3]  When they arrived, at about 7 p.m., they saw Hunt's van outside.  Gilliland got out of the car and entered the residence; Lane left in the Yugo.

Once inside, Gilliland encountered Hunt.  Hunt, having noticed Lane in the Yugo, asked Gilliland, "You mean Karen is with you and she didn't get out because I was here?  Where was she going?"  Gilliland replied that Lane had gone to her mother's home.  Hunt left.

After leaving, Hunt drove to the home of James Mullinax and Hortencia Ovalle in Jasper, Alabama, arriving at about 8 or 8:30 p.m.[4]  While there, Hunt again discussed his frustration with Lane.  Mullinax testified that Hunt "kept on saying he was going to have to do something about the problem."  Both Mullinax and Ovalle testified that as he left, Hunt said he was going to "fuck somebody up."

Hunt then returned to Cordova.[5]  At about 9:40 p.m., he called Cook's residence to speak to Gilliland.  Hunt's mother, Ruby Savage, lived in Cordova, at

---

[3]  Gilliland testified that Cook's home was about seven miles from her apartment. According to Cook, the drive from his home to Gilliland's took 20 to 30 minutes.

[4]  According to the American Automobile Association ("AAA") map of Alabama, Parrish and Jasper lie approximately eight miles apart.

[5]  According to the AAA map, Jasper and Cordova are roughly eight miles apart.  By Ovalle's estimate, the drive from her home to Cordova took about 30 minutes.

407 Second Street, and Hunt made the call from there.[6] According to Gilliland, Hunt asked where Lane was. Gilliland told him that Lane told her she was going to her mother's home. Hunt warned, "I know how you women are. You better tell me where she's at." When Gilliland replied that she did not know where Karen was, Hunt again insisted, "You better tell me where she is at. . . . Or, it is going to be detrimental to you." Hunt said he was ready to go back to prison if that was what it took.

Later that night, in Cordova, Lane's father, W.O. Sanders, discovered that a house Lane had previously occupied was on fire.[7] Sanders, who lived about two hundred yards from that house, testified that he heard Hunt's van pass his house twice that night. It was after the second time the van passed that Sanders discovered the fire.

After calling Gilliland and driving by Sanders's house, Hunt left Cordova and returned to Jasper. When Debra Twilley left work at 11 p.m. and returned to her home in Jasper, Hunt was there, using her telephone. According to Twilley, it appeared that Hunt "had been drinking." Hunt followed her into the kitchen,

---

[6] According to the bill for Hunt's mother's home telephone, a call was placed from her home to Clinton Cook's home at 9:40 p.m., about the same time that, according to Gilliland and Cook, Hunt called. Hunt's mother testified, however, that she did not see Hunt between the time he left her home after having dinner there and the time he returned home around 11:30 p.m. or midnight.

[7] Sanders and his wife owned the house.

where he asked to borrow her car.  "I've got some stuff I need to do," he explained.  "It's not wise that I'm seen in my van."

After Twilley refused his request, the conversation turned to Lane.  Hunt said that he and Lane had been having problems and that he was "tired of her crap."  And he admitted that he had burned her house.  He had "poured gas on it," he said, "and set it afire."  When Twilley asked why, he replied, "I'm just tired of everything."  He asked Twilley to drive him to Cordova.  He did not know whether the house had "burnt down all the way," he said.  But, he told Twilley, he hoped it had.

After that conversation, Hunt returned to Cordova.  Amy Sheree Long testified that, at about midnight or 12:30 a.m. the next day, August 2, as she was standing in the parking lot at the First National Bank, she saw Hunt in his van, chasing Lane in a beige Yugo at a high speed.

Hunt then returned to his mother's home in Cordova and, at 12:55 a.m., again called Cook's residence.[8]  This time he spoke with Cook.  According to Cook, Hunt said that "something had happened, materialistically, and that Karen's family and Karen [were] going to be upset with him . . . because of what he had done."  Hunt said he would have to move back to Florida.  But, he said, "people

---

[8]  We draw the time of the call and the location from which it was placed from Hunt's mother's telephone bill, which the State introduced as an exhibit at trial.

6

didn't screw him over like this and get away with it."

Around 1 a.m., Hunt called Lane's mother, Betty Jo Sanders.[9]  According to Sanders, Hunt asked her if Karen was there, and she answered no.  Sanders told him that Karen's house had burned.  "Well," Hunt said, "Karen will really be hurt about that because she really loved that place. . . .  It will really depress her."  Hunt also told Sanders that he had been looking for Karen.  "[S]he is running stop signs and lights," Hunt said, "and all I want to do is say 'Hi' to her but she will not stop."  Hunt also threatened violence against Gilliland.  "You know, Tina [Gilliland] is scum," he said.  "I'm going to throw her up against the wall, do you know what I mean?  I won't do to m[e]ss with.  I grew up in violence.  I know what it's all about."

Later, shortly before 2 a.m., Mary Turner, who lived at 103 Elliott Heights, in an apartment separated from Gilliland's by one other apartment, heard a noise that sounded like glass breaking.  Turner testified that when she looked to see what had caused the noise, she saw Hunt reach his hand into the window of Gilliland's

---

[9] Sanders testified about this call and a call Hunt made to her earlier that night.  During the earlier call, Hunt asked Sanders if she knew where Karen was.  Sanders told him that Karen had called and said that "she was going to take Tina to Clint's house."  Hunt asked her who Clint was, where he lived, and what his telephone number was.  Sanders thought this call came at 8:30 to 8:45 p.m., on August 1, but it likely came earlier.  By 8:30, Hunt had already been to Clinton Cook's residence, making it unlikely that he would ask who Clint was and where he lived.  Also, Mullinax and Ovalle testified that from 8:30 to 8:45, Hunt was at their home in Jasper.  And neither of them mentioned Hunt using the telephone while he was there.

7

apartment and then enter through the adjacent door.  After Hunt entered, Turner heard "peculiar noises"—one that sounded "like somebody had hit real hard, hit the floor," and another "like somebody sitting in a chair and just sliding it across the floor."  Then, at about 2 a.m., she heard the door slam and looked out her window to see Hunt leaving the apartment.

At 2:44 a.m., Cook received another telephone call from Hunt.[10]  Hunt was calling from Gilliland's apartment.  Hunt told him that Karen was "lying [t]here in the kitchen floor" and asked Cook to "get somebody up [t]here to get her to the hospital."  Karen Lane's body was discovered in Gilliland's apartment later that morning.

Evidently, after calling Cook, Hunt returned to Jasper.  Both Mullinax and Ovalle testified that they found Hunt's van outside their home at about 6 a.m.  According to Mullinax, Hunt was in the van and, as Mullinax left for work, "raised up a little bit and went back down."

Later that day, Hunt drove to Cullman, Alabama, to Jack and Jean Kilpatrick's house.[11]  From there, at about 7 or 8 p.m., Hunt called his brother-in-law, Russell Davenport, at his home in Cooper City, Florida.  According to

---

[10]  Cook testified that he received the call around 2:30 or 3 a.m. We draw the exact time from Gilliland's telephone bill, which the State introduced into evidence at trial.

[11]  According to the AAA map, Cullman is roughly 40 miles from Jasper.

Davenport, Hunt said he had "been out partying" with a woman and had gotten into a fight with her. "I don't think I killed her," Hunt said. "I'm not sure how she was when I left her. I checked with the hospitals and newspapers and I can't find anything else out about her at all."

Hunt was arrested later that month. In October, his sister, Loretta Martin, visited him in jail. Martin testified that they discussed Karen Lane's death. During their conversation, she asked Hunt, "You did kill her?" Hunt said, "Yes, I did." Hunt explained that he and Lane had a fight on the night of her death. Hunt said he "hit her and lost his head and couldn't control himself." Hunt told Martin that he had "[gone] out looking for [Lane]" and "chased her through Cordova." When Martin asked him if he had been drinking, he said he had been "drinking and taking some medication that the doctor had prescribed for him."

Later, in June 1990, while he was detained in jail pending trial, Hunt also confessed to his cellmate. The cellmate, James Carr Sanders, testified that Hunt said that he and Lane had fought because she was dating someone else. He had "knocked her down and choked her and kicked her." He also inserted a broomstick into her vagina. After that, he saw that she was bleeding, became scared, and called the police.

Dr. Joseph Embry, the physician who autopsied Karen Lane's body, testified

9

that Lane had sustained some sixty injuries.  Among those were about twenty injuries to the head, including lacerations, external bruises, bruises to the brain, fractured cheekbones, and nasal bones broken into small pieces.  Lane also had twelve rib fractures on each side of her body and a fractured breastbone.  Her heart and lungs were bruised, as was her pancreas, and she had a three-quarter-inch tear in her aorta and three tears in her liver.  She also had bleeding in the muscles in her neck, as well as numerous bruises and lacerations on her arms, legs, chest, and back.

Larry Huys, a serologist employed by the Alabama Department of Forensic Sciences, analyzed swabs from Lane's vagina, mouth, and anus.  According to Huys, the oral swabs revealed that Lane's mouth contained semen.  Huys said that the quantity and condition of the sperm found in Lane's mouth suggested that the semen was deposited "very close . . . to the time of death"—no more than an hour before—"if not postmortem."

Huys also examined a broomstick found between Lane's legs at the scene of the killing.  He testified that on that broomstick he found epithelial cells indicating the presence of mucus secretions.  Those mucus secretions, he said, could have come from Lane's vagina.

A fingerprint analyst, John Vaughn, testified that a bloody palm print found

10

at the scene of the crime had been successfully matched to Hunt.  Vaughn also testified that prints found on the screen from the kitchen window of Gilliland's apartment were matched to Hunt's right palm, right index finger, and left ring finger.

B.

The strategy Hunt's attorneys pursued in confronting the State's case was to create a reasonable doubt about Hunt's guilt through cross-examination of the State's witnesses, as well as through their own evidence presented after the State rested.  To that end, they brought out through John Vaughn on cross-examination that some fingerprints found at the scene of the crime could not be matched to Hunt or Lane, and that no fingerprints were found on the stool and broomstick found near Lane's body.  They also established through Vaughn that no scratches or bruises—in other words, no signs of a struggle—were found on Hunt's body during a post-arrest examination.

In addition to eliciting this forensic information, the attorneys attacked the credibility of Loretta Martin's and James Carr Sanders's statements that Hunt had confessed to Lane's murder.  Martin, after claiming on direct examination that Hunt confessed to her in jail in October 1988, admitted on cross-examination that she did not mention the confession in her initial statement to the prosecutors, and

11

that she waited for over a year after Hunt confessed to inform the district attorney's office about it. As for Sanders, counsel tried, albeit unsuccessfully, to get him to admit that he hoped his testimony to Hunt's confession would earn him leniency in the final disposition of his pending theft charge and motion to revoke his probation.

After the State rested, Hunt's attorneys presented three witnesses of their own to cast further doubt on whether Hunt was Lane's assailant. They called John Tirey, one of the law enforcement officers who had investigated Lane's death. Tirey testified that, in order to obtain a warrant to search Hunt's van, he had signed an affidavit stating that Lane had died at about 12 a.m. on August 2. As Hunt's attorneys pointed out in their closing argument, the State's evidence showed that Hunt had been at Debra Twilley's home in Jasper at that time. Tirey also testified that investigators had never identified the owners of bloody clothing—a pair of boys' underwear, a pair of panties, and pieces of a bra—found at the scene of Lane's murder.

Hunt's attorneys also called Nellie Freeman, one of Gilliland's neighbors. Freeman testified that at about 11:30 p.m. on August 2 she had seen someone knocking on Gilliland's door. Freeman could not identify the person she had seen. But Hunt's attorneys pointed out in their closing argument that Hunt had been at

12

Twilley's home in Jasper at that time, suggesting that whoever knocked on Gilliland's door might have been Lane's killer but could not have been Hunt.

Hunt's counsel also called Ruby Savage, Hunt's mother, to impeach Loretta Martin's testimony that Hunt had confessed to the murder. Savage testified that Martin had always harbored animosity toward Hunt, thereby calling into question Martin's motive for testifying.

In addition to attempting to create a reasonable doubt about whether Hunt was Lane's assailant, counsel questioned—through cross-examination of prosecution witnesses and in their argument to the jury at the close of the guilt phase of the trial—whether the evidence proved that Lane had been sexually abused.[12] To counter the State's allegations of sexual abuse, they elicited testimony from Dr. Embry that his autopsy revealed no damage to Lane's vagina. Counsel also elicited testimony from Larry Huys that the mucus secretions found on the broomstick could have come from the mouth or nose. Using this testimony for support, counsel argued to the jury that the broomstick had not been inserted into Lane's vagina. Counsel also contended in their closing argument that the mere

---

[12] In this case, the State had to prove sexual abuse to ensure Hunt's eligibility for the death penalty. As noted above, the indictment charged Hunt with three counts of capital murder: two counts of murder during sexual abuse or attempted sexual abuse, under Alabama Code § 13A-5-40(a)(8), and one count of murder during a burglary or attempted burglary—specifically, unlawfully entering or remaining in a dwelling with intent to commit sexual abuse—under § 13A-5-40(a)(4).

13

presence of semen did not, by itself, prove that the victim had been sexually abused.

Counsel's defense strategy proved unsuccessful. The jury returned verdicts of guilty on all three counts of capital murder and, later the same day, at the close of the penalty phase of the trial, recommended the imposition of a death sentence. On July 27, 1990, the circuit court imposed that sentence.[13] On direct appeal, Hunt's convictions and death sentence were affirmed by the Alabama Court of Criminal Appeals, Hunt v. State, 659 So. 2d 933, 960 (Ala. Crim. App. 1994), and the Alabama Supreme Court, Ex parte Hunt, 659 So. 2d 960, 961 (Ala. 1995), and the U.S. Supreme Court declined certiorari review, Hunt v. Alabama, 516 U.S. 880, 880, 116 S. Ct. 215, 215, 113 L. Ed. 2d 146 (1995).

## C.

On February 18, 1997, after his direct appeals had failed, Hunt, proceeding pro se, petitioned the Walker County Circuit Court for post-conviction relief

---

[13] We do not dwell on the penalty phase of Hunt's trial because the question whether Hunt's attorneys were ineffective at that phase is not before us. No issue regarding counsel's penalty-phase effectiveness is specified in the certificate of appealability. See Diaz v. Sec'y for the Dep't of Corr., 362 F.3d 698, 702 (11th Cir. 2004) (per curiam) (citing Murray v. United States, 145 F.3d 1249, 1250–51 (11th Cir. 1998) (per curiam)) ("Appellate review in a § 2254 proceeding is limited to the issues specified in the certificate of appealability ('COA').").

pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.[14] His petition

alleged, among other things, that he had been denied the effective assistance of

counsel in preparing for and handling his defense at trial, as well as on direct

appeal, in violation of the Sixth and Fourteenth Amendments.[15] On March 25,

---

[14] Though Hunt's initial petition was not signed by an attorney, it was evidently prepared by one. That much is clear both from the legal analysis the petition contains and from Hunt's reference to the petition in a letter to the circuit court as a "motion[] filed by an agency in my behalf." Hunt's subsequent mention of the Equal Justice Initiative (the "EJI"), a private nonprofit organization that litigates on behalf of indigent prisoners, in another letter to the court suggests that an EJI staff attorney may have prepared the petition.

On the same day the petition was filed, Hunt filed a motion for the appointment of counsel. The record does not reflect a ruling by the circuit court on that motion. But on July 15, 1997, Arnold Levine, an attorney employed by the Legal Aid Society in New York, filed discovery motions on Hunt's behalf. Levine, who was licensed to practice law only in New York, had not yet applied for admission pro hac vice to practice in Alabama.

On June 18, 2001, another attorney, Cheryl J. Moran, who was employed by New York County Defender Services, a nonprofit law firm that contracts with New York City to represent indigent criminal defendants, filed a letter to the circuit court. The letter stated that Moran now represented Hunt and intended to apply for admission pro hac vice to practice law in Alabama. On June 21, 2001, Hunt filed a letter to the court stating that Moran, not Levine, was now his attorney. But so far as the record shows, Moran never appeared in court or filed anything on Hunt's behalf. Instead, Levine continued to file documents and appear in court on Hunt's behalf, though he did not file an application for admission pro hac vice until after the circuit court, on March 4, 2002, ordered him to do so. Accordingly, when we refer throughout this opinion to Hunt's Rule 32 counsel, we refer to Levine.

Notably, even after Levine began to appear on Hunt's behalf, Hunt repeatedly circumvented Levine to file pro se letters to the court insisting that the court not consider any challenges to the penalty phase of his trial, including any ineffective-assistance claims, and complaining of delays in his Rule 32 proceedings. Hunt filed such letters on February 18, 1997; April 2, 1997; February 24, 1999; November 29, 1999; January 10, 2001; April 5, 2001; April 25, 2001; May 17, 2001; December 10, 2001; and March 20, 2002.

Hunt also filed a pro se habeas petition in the U.S. District Court for the Northern District of Alabama on May 15, 2002, before his Rule 32 petition had been disposed of. On August 8, 2002, the district court dismissed that petition without prejudice to allow Hunt to exhaust his state remedies. Hunt v. Jones, No. 6:02-cv-01213-ELN-RRA (N.D. Ala. Aug. 8, 2002).

[15] See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); Cuyler v. Sullivan, 446 U.S. 335,

2002, Hunt, with the assistance of counsel, filed an Amended and Restated Petition for Relief from Judgment Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure (the "Amended Petition" or "Amended Rule 32 Petition").

The Amended Petition realleged that Hunt had been denied the effective assistance of counsel in preparing for and at his trial, as well as on direct appeal. The Amended Petition supported these allegations with numerous citations of attorney error. We address only the errors—the instances of ineffective assistance—at issue in this appeal.[16]

One of the errors was trial counsel's alleged failure to conduct a competent cross-examination of James Sanders. Rule 32 counsel contended that trial counsel should have inquired into the facts underlying Sanders's past criminal convictions and thus provided the jury with further cause for rejecting his testimony as untrustworthy. In addition, they should have corrected a misimpression left by the prosecutor's direct examination: that Sanders, who was in jail on a pending charge

---

344, 100 S. Ct. 1708, 1716, 64 L. Ed. 2d 333 (1980) ("Our decisions make clear that inadequate assistance does not satisfy the Sixth Amendment right to counsel made applicable to the States through the Fourteenth Amendment.").

[16] The errors we do not address include trial counsel's failure to obtain a change of venue, inadequate preparation for both the guilt and penalty phases of the trial, inadequate investigation and presentation of mitigating evidence at the penalty phase, failure to object to several allegedly improper remarks in the State's closing argument in the guilt phase, and failure to make an effective closing argument in the guilt phase.

of theft and a petition to revoke probation, was certain to face at least a fifteen-year prison sentence and therefore had nothing to gain by testifying. Another error was trial counsel's failure to request, at the close of the guilt phase, jury instructions on the lesser included—and noncapital—offenses of manslaughter and felony murder, and on the defense of voluntary intoxication.

The circuit court set December 17, 2001, as the date for the evidentiary hearing on the Amended Rule 32 Petition. To assess Rule 32 counsel's progress in obtaining the evidence counsel would need to present at the hearing, the court held a conference on November 9, 2001. At that conference, it became apparent that counsel would not be prepared to go forward with the evidentiary hearing scheduled for December 17; the court therefore postponed the hearing to a date to be set later. On December 17, instead of an evidentiary hearing, the court held another conference. At the conclusion of the December 17 conference, the court, concluding that Rule 32 counsel would need at least three more months of preparation, scheduled the evidentiary hearing for April 8, 2002. The court subsequently extended that date to July 22, 2002. The seven months' extension—from December 17, 2001, to July 22, 2002—gave Rule 32 counsel ample opportunity to obtain and present the evidence needed to support Hunt's

claims.

At the July 22 hearing, however, Rule 32 counsel was unable to present even one witness to testify in support of Hunt's ineffective-assistance allegations. Both of Hunt's trial attorneys were deceased, and Hunt did not testify. Rule 32 counsel had hoped to introduce the testimony of four witnesses who, he claimed, would have testified that trial counsel never contacted them and that, had they been asked, they would have testified favorably at the penalty phase. But none of those witnesses came to the hearing. Counsel did offer hearsay testimony, through his associate, to statements that two of those witnesses would have made had they appeared.[17] That offer was rebuffed on the ground that the statements were hearsay and thus inadmissible in Rule 32 proceedings.[18] Counsel then offered the affidavits

---

[17] The statements were made by Kim Abreu, one of Hunt's sisters, and Jeff Hunt, one of Hunt's brothers. The associate whose testimony counsel sought to introduce was Mary Lynne Werlwas, an attorney employed by the Legal Aid Society in New York. According to Rule 32 counsel, Werlwas had assisted in preparing for the hearing and had spoken with those witnesses. Werlwas did not otherwise appear on Hunt's behalf during the Rule 32 proceedings.

[18] Counsel argued that because hearsay would have been admissible at his sentencing proceeding, it should be admissible at the Rule 32 proceeding on the issue of counsel's penalty-phase ineffectiveness. The circuit court rejected this argument, as did the court of criminal appeals. Hunt v. State, 940 So. 2d 1041, 1051 (Ala. Crim. App. 2005).

of two other witnesses,[19] but the court excluded those as well.[20] At the end of the

day, counsel was unable to present any evidence showing that Hunt's trial

attorneys' performance was constitutionally deficient.

Specifically, counsel was unable to establish what Hunt and his trial

attorneys might have said to one another prior to and at trial; what the attorneys

had or had not done in preparing for trial;[21] why they had pursued the trial

strategies disclosed by the trial transcript; why they had cross-examined Sanders as

they did; and why, at the close of the guilt phase, they had not requested jury

instructions on lesser included offenses and the defense of intoxication.[22] As for

trial counsel's allegedly ineffective cross-examination of Sanders, Rule 32 counsel

---

[19] The affidavits were from Ruby Savage, Hunt's mother, and Rodney Blair Hunt, a brother.

[20] Rule 32.9 of the Alabama Rules of Criminal Procedure provides that, in a Rule 32 evidentiary hearing, "[t]he court in its discretion may take evidence by affidavits." Ala. R. Crim. P. 32.9(a) (emphasis added). The court of criminal appeals upheld the circuit court's exclusion of the affidavits, reasoning that "the circuit court did not err in excluding the affidavits because they were introduced for the first time at the evidentiary hearing." Hunt, 940 So. 2d at 1051.

[21] To support Hunt's allegation that his trial attorneys' pretrial investigation and preparation were inadequate, Rule 32 counsel presented only a fee declaration presented to the circuit court showing 80 hours of in-court work and 45 hours of out-of-court work by one of the two trial attorneys, and the investigator's invoice for work performed.

[22] As for counsel's failure to request an intoxication instruction, Rule 32 counsel introduced no evidence at all regarding Hunt's intoxication or mental state on the night of the murder.

19

did present documentary evidence of Sanders's criminal history,[23] and that Sanders was placed back on probation on July 5, 1990, less than a month after Hunt's trial. Counsel did not show, however, that Sanders had been offered anything in exchange for his testimony.[24]

As it turned out, Rule 32 counsel was able to do little more than refer to the allegations contained in the Amended Petition and argue that the court should, on the basis of his arguments, accept the allegations as proven and thereby grant relief. The State objected to counsel's arguments, contending that they did not constitute evidence, but the court permitted counsel to proceed.[25] In short, the

---

[23] That evidence showed that on June 12, 1989, Sanders pled guilty to first-degree theft, attempted possession of burglary tools, third-degree receipt of stolen property, and third-degree theft. Originally Sanders was sentenced to two years' imprisonment on the first-degree theft charge and 12 months on the other three charges, all to run concurrently. But on July 31, 1989, after Sanders applied for probation, he was given a split sentence of 90 days in the Walker County Jail followed by 21 months on probation. The evidence introduced by Hunt's Rule 32 counsel also showed that a warrant for Sanders's arrest, based on an alleged probation violation, issued on May 30, 1990.

[24] The Amended Petition alleged that Sanders was released from jail soon after Hunt's trial, apparently inferring that the theft charge had been dismissed in exchange for his testimony. But at the Rule 32 hearing, an assistant attorney general appearing on behalf of the State represented to the court that the charge "was, in fact, no billed by [a] Walker County Grand Jury some weeks later"—not dismissed by the State pursuant to a deal with Sanders. Hunt's Rule 32 counsel did not dispute or object to that representation, though invited to do so by the court.

[25] When the assistant attorney general representing the State complained that "the purpose [of] the hearing . . . [was] to present evidence, not to make argument on the part of counsel," the court explained, "This man is on death row, and I'm not going to play with the legalities of all of this."

court indulged counsel's summarization of the Amended Petition. Counsel's argumentative presentation was, however, to no avail. The court had been given no evidentiary basis for evaluating trial counsel's preparation, investigation, or strategic decision making or for setting aside Hunt's convictions or death sentence.

On December 17, 2002, the circuit court entered an order rejecting all of Hunt's claims and denying relief. The court found that Hunt had not proved that his attorney's cross-examination of Sanders was deficient and, further, had "presented no evidence at his evidentiary hearing that trial counsel could have used to further impeach [Sanders's] testimony." Final Order at 49, Hunt v. State, No. CC-89-76.60 (Ala. Walker Cnty. Cir. Ct. Dec. 17, 2002). The court also found that Hunt had failed to establish that counsel's failure to request jury instructions on intoxication, manslaughter, and felony murder was prejudicial and warranted relief.[26]

Hunt appealed the circuit court's decision to the Alabama Court of Criminal Appeals. That court affirmed. Hunt v. State, 940 So. 2d 1041, 1072 (Ala. Crim.

---

[26] The circuit court also ruled, alternatively, that these claims were procedurally barred under Alabama state law. The Alabama Court of Criminal Appeals concluded, however, that these procedural rulings were erroneous and upheld the circuit court's rejection of these claims on the merits instead. See Hunt, 940 So. 2d at 1054–55 (concluding that although the case relied on by the circuit court in holding that Hunt's claims were time barred had since been overruled, the circuit court's alternative grounds supported its denial of relief).

App. 2005). The court upheld the circuit court's rejection of two of the claims before us: Hunt's claims that trial counsel was ineffective in cross-examining Sanders, id. at 1064–65, and in not requesting an intoxication instruction, id. at 1066–67. Such an instruction, the court said, "would have been inconsistent with counsel's defense strategy." Id. at 1067.

The court also addressed and rejected an argument Rule 32 counsel had made to the circuit court while summarizing the Amended Petition's allegations of trial attorney error: that even if no individual error was sufficient to establish a claim of ineffective assistance, the errors, if considered cumulatively, demonstrated that the legal representation Hunt received was constitutionally ineffective. Id. at 1071–72. The court rejected this argument, quoting at length from Brooks v. State, 929 So. 2d 491 (Ala. Crim. App. 2005), a case in which the court had rejected the principle that the cumulative effect of multiple errors can establish ineffective assistance of counsel. Hunt, 940 So. 2d at 1071–72 (quoting Brooks, 929 So. 2d at 514). The lengthy quote from Brooks ended with an alternative holding: "'If we were to evaluate the cumulative effect of the ineffective assistance of counsel claims, we would find that Brooks's substantial rights were not injuriously affected.'" Id. at 1072 (quoting Brooks, 929 So. 2d at 514). The court concluded

22

its discussion of Hunt's cumulative-effect argument with a similar remark: "We, likewise, cannot say that Hunt's substantial rights were injuriously affected." Id.

## D.

After his petition to the Alabama Supreme Court for the writ of certiorari was denied, Ex parte Hunt, No. 1050302 (Ala. Apr. 21, 2006), Hunt petitioned the U.S. District Court for the Northern District of Alabama for a writ of habeas corpus. See 28 U.S.C. § 2254. His petition asserted the same ineffective-assistance-of-counsel claims he had litigated in the Alabama courts, as well as other claims not before us.[27] The district court denied the writ, rejecting each of Hunt's claims either on the merits or because of a procedural default. At Hunt's request, the district court granted a certificate of appealability on four issues:

> Whether the Alabama State courts placed on Mr. Hunt the burden of presenting extrinsic evidence of prejudice for his claims of ineffective assistance of counsel contrary to Strickland v. Washington, 466 U.S. 668[, 104 S. Ct. 2052, 80 L. Ed. 2d 674] (1984).

---

[27] Hunt's petition also asserted, among other things, that the State had violated its obligations under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); that numerous other instances of prosecutorial misconduct had deprived him of a fair trial and sentence determination; that the trial court's denial of Hunt's motion for a change of venue, and its denial of Hunt's for-cause challenges to certain jury venire members, deprived him of a fair trial; that the grand and petit juries did not reflect a fair cross-section of the community; that the penalty phase of his trial had been improperly rushed and that, at that phase, the jury instructions and verdict forms had improperly biased the jury in favor of a death sentence; that the trial court had improperly refused to consider mitigating evidence at sentencing; and that numerous purported defects in Alabama's sentencing procedures violated Hunt's constitutional rights.

23

Whether the cumulative error doctrine applies to claims of ineffective assistance of counsel, and, in this case, warranted reversal.

Whether trial counsel's assistance was ineffective based on trial counsel's cross examination of, and failure to object to the direct examination of[,] the prosecution's witness James Carr Sanders.

Whether trial counsel's assistance was ineffective based on trial counsel's failure to request guilt-phase instructions on intoxication, manslaughter, and felony-murder, individually and cumulatively.

II.

A.

Our review of Hunt's ineffective-assistance claims is circumscribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Under AEDPA, a federal court may not grant habeas relief on a claim previously adjudicated in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

As the Supreme Court has explained, the statutory phrase "clearly established Federal law" refers only to "the holdings, as opposed to the dicta, of [the U.S. Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L.

24

Ed. 2d 389 (2000). A state court decision is "contrary to" such law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412–13, 120 S. Ct. at 1523. The "unreasonable application" clause of § 2254(d) permits a federal court to grant habeas relief "if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. at 1523. Merely incorrect application of federal law, however, is not enough to warrant habeas relief. Instead, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004)). Notably, AEDPA also establishes a presumption that the state court's findings of fact are correct. 28 U.S.C. § 2254(e)(1). This presumption can be rebutted only by clear and convincing evidence. Id. Our review of the Alabama courts' decisions on Hunt's claims is accordingly deferential.

B.

We evaluate claims of ineffective assistance of counsel under the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To succeed on an ineffective-assistance claim, the petitioner must show (1) that counsel's performance was deficient and (2) that counsel's deficient performance prejudiced the defense. Id. at 687, 104 S. Ct. at 2064.

The performance prong is satisfied only if the petitioner "show[s] that counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. Because "[t]here are countless ways to provide effective assistance in any given case," id. at 689, 104 S. Ct. at 2065, "the range of what might be a reasonable approach at trial must be broad," Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). Thus, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Id. at 1315.

The prejudice prong requires the petitioner to establish a "reasonable probability" that, but for counsel's errors, the outcome at trial would have been different. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Both Strickland and AEDPA prescribe "highly deferential" review. Richter, — U.S. at —, 131 S. Ct. at 788 (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; Lindh v. Murphy, 521 U.S. 320, 333 n.7, 117 S. Ct. 2059, 2066 n.7, 138 L. Ed. 2d 481 (1997)) (internal quotation marks omitted). Where, as here, both apply, our "review is 'doubly' so." Id. (quoting Knowles v. Mirzayance, 556 U.S. 111, —, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009)); cf. Childers v. Floyd, 642 F.3d 953, 972 (11th Cir. 2011) (en banc) (observing that, because of the presumption under 28 U.S.C. § 2254(e)(1) that state court findings of fact are correct, "where factual findings underlie the state court's legal ruling, our already deferential review [under § 2254(d)] becomes doubly so").

III.

We begin by addressing the claim that the Alabama courts improperly required Hunt to prove prejudice using extrinsic evidence. We then turn to the specific ineffective-assistance claims at issue: trial counsel's cross-examination of James Carr Sanders and failure to request jury instructions on manslaughter, felony murder, and intoxication. Finally, we address the claim that even if no single error establishes ineffective assistance, the cumulative effect of counsel's purported

27

errors entitles Hunt to habeas relief.[28]

A.

Hunt argues first that, in rejecting his ineffective-assistance claims, the Alabama courts improperly required him to prove prejudice using extrinsic evidence. In other words, he was precluded from relying solely on the records of the trial and the direct appeal from his conviction; rather, he had to present evidence—testimony or documents—beyond those records. This requirement, according to Hunt, contravenes Supreme Court precedent under which the Strickland prejudice analysis depends on "the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'" Wiggins v. Smith, 539 U.S. 510, 536, 123 S. Ct. 2527, 2543, 156 L. Ed. 2d 471 (2003) (alteration in original) (emphasis omitted) (quoting Williams v. Taylor, 529 U.S. 362, 397–98, 120 S. Ct. 1495, 1515, 146 L. Ed. 2d 389 (2000)).

To support his interpretation of the Alabama courts' decisions, Hunt points

---

[28] Hunt also argues in his brief that his attorneys were ineffective in failing to object to the prosecutors' closing arguments, failing to mount an adequate closing argument on Hunt's behalf, and failing to raise on direct appeal a claim under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Because these claims are not included as issues in the certificate of appealability, we do not consider them except as they bear on the cumulative-effect issue specified in the certificate of appealability. See Diaz v. Sec'y for the Dep't of Corr., 362 F.3d 698, 702 (11th Cir. 2004) (per curiam) (citing Murray v. United States, 145 F.3d 1249, 1250–51 (11th Cir. 1998) (per curiam)) ("Appellate review in a § 2254 proceeding is limited to the issues specified in the certificate of appealability ('COA').").

to language in the circuit court's order rejecting several of his claims on the ground that he "presented no evidence at his evidentiary hearing that would establish [prejudice]." Final Order at 45–47, 50, 57–60, <u>Hunt v. State</u>, No. CC-89-76.60 (Ala. Walker Cnty. Cir. Ct. Dec. 17, 2002). "Prejudice," the circuit court reasoned, "cannot merely be alleged; it must be affirmatively proved." <u>Id.</u> (quoting <u>Williams v. State</u>, 783 So. 2d 108, 119 (Ala. Crim. App. 2000)) (internal quotation marks omitted). The court of criminal appeals, as Hunt points out, affirmed the circuit court's rejection of several claims on that ground:

> The circuit court's finding that Hunt failed to meet his burden of proof in regard to th[ese] claim[s] is supported by the record. At the Rule 32 evidentiary hearing, Hunt presented little evidence in support of his numerous claims of ineffective assistance of counsel. No witnesses testified at the Rule 32 hearing, and little demonstrative evidence was introduced. At the evidentiary hearing counsel read portions of his amended Rule 32 petition to the circuit court. Hunt made no attempt to satisfy his burden of proof under Rule 32.3, or to satisfy the requirements set out by the United States Supreme Court in <u>Strickland</u>.

<u>Hunt v. State</u>, 940 So. 2d 1041, 1055–56 (Ala. Crim. App. 2005) (footnote omitted) (citation omitted).[29]

We are not persuaded that the Alabama courts required Hunt to prove

---

[29] Rule 32.3 of the Alabama Rules of Criminal Procedure states, in pertinent part, "The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Ala. R. Crim. P. 32.3.

prejudice through extrinsic evidence. Some language those courts employed could perhaps be read to support Hunt's argument. But nothing in their orders or opinions explicitly required extrinsic evidence. Instead, it appears that the courts simply required Hunt to present evidence of prejudice—extrinsic or not—and reasonably concluded that he had failed to do so.

That the Alabama courts did not demand extrinsic evidence becomes clearer when one considers how Hunt supported, or failed to support, the specific claims at issue. One, for instance, was Hunt's claim that his trial attorneys were ineffective in failing to object to comments by the prosecutors that, according to Hunt, were intended to incite improperly the passions of the jury. Hunt's Amended Rule 32 Petition simply listed these comments. Neither in his evidentiary hearing nor in any other filing in the circuit court did Hunt present anything further—extrinsic or otherwise—to support the assertion that counsel's failure to object to those comments had prejudiced him. The same is true, for example, of Hunt's claim that his attorneys were ineffective when they failed to object to the introduction of provocative sketches.

Hunt therefore cannot claim that he painstakingly assembled evidence of prejudice from the trial record only to be rebuffed because he lacked extrinsic

evidence.  Instead, he flatly asserted the existence of prejudice and was met with the admonition that "[p]rejudice cannot merely be alleged; it must be affirmatively proved."  Final Order at 45–47, 50, 57–60, Hunt, No. CC-89-76.60 (quoting Williams, 783 So. 2d at 119) (internal quotation marks omitted).  Against this background, the Alabama Court of Criminal Appeals' conclusion that Hunt "made no attempt to satisfy his burden of proof," Hunt, 940 So. 2d at 1055, cannot be read as a demand for extrinsic evidence.  Having found that the Alabama courts did not improperly require extrinsic evidence of prejudice, we turn to the specific ineffective-assistance claims at issue in this appeal.

## B.

Hunt claims that his trial attorneys rendered ineffective assistance by inadequately cross-examining James Carr Sanders.[30]  In rejecting this claim, Hunt argues, the Alabama Court of Criminal Appeals unreasonably determined the facts and unreasonably applied clearly established federal law.  Hunt argues, in essence, that his attorneys should have done more on cross-examination to show that Sanders was biased because he hoped to receive leniency on a pending theft charge in exchange for his testimony.  Hunt also asserts that his attorneys should have

---

[30]  As explained in part I.A, supra, Sanders testified that while he and Hunt shared a jail cell, Hunt admitted that he had attacked Karen Lane and inserted a broomstick into her vagina.

31

used Sanders's criminal record to further impeach his credibility.

Hunt has not convincingly explained how his attorneys' cross-examination of Sanders could have accomplished much more than it did. Counsel tried repeatedly to elicit an admission that Sanders expected some benefit in exchange for testifying against Hunt—persistently enough to suggest this motivation to the jury even if Sanders denied it. In an apparent effort to show how much Sanders stood to gain, counsel elicited an admission that Sanders faced more than two years' imprisonment if his probation was revoked because of the theft charge. Counsel also asked Sanders whether he knew he could face a significant prison sentence on the theft charge itself under Alabama's habitual offender law. Counsel emphasized, moreover, that Sanders had first reported Hunt's confession to his lawyer, not to any law enforcement official, suggesting that he sought to further his own interests.

Not all of counsel's efforts were successful. Sanders insisted that he did not expect to gain anything by testifying. But the record does not reveal any means by which counsel might have pursued this line of cross-examination more fruitfully. Cf. Johnson v. Alabama, 256 F.3d 1156, 1186 (11th Cir. 2001) ("Absent a showing that real impeachment evidence was available and could have been, but was not,

32

pursued at trial, [the petitioner] cannot establish that the cross conducted by his attorneys fell outside the range of professionally competent assistance."). Sanders testified on direct examination that he had not reached any agreement with the State guaranteeing him a benefit in exchange for his testimony. And Hunt introduced no evidence of such an agreement at his Rule 32 proceeding. In the absence of any agreement, counsel could do little more than expose what Sanders stood to gain if he received leniency and suggest to the jury that the hope of such leniency motivated his testimony. This counsel did.

Hunt argues that his trial attorneys failed to respond adequately to misstatements by the prosecutor that left the impression that Sanders was certain to serve at least fifteen years regardless of his testimony. The prosecutor began his redirect examination by stating, "You are going to the penitentiary for a minimum of fifteen years under the habitual offender law." The prosecutor later repeated, "You're going to the [penitentiary] for a minimum of fifteen years." Although Hunt's counsel apparently objected to these statements,[31] counsel did not request

---

[31] The record does not reflect an explicit objection to the second statement. It does show, however, that the court, immediately after that statement, said, "Sustain your objection."

33

any curative instruction from the trial court.[32]  Hunt argues that his counsel should have elicited testimony that the sentence, if any, that Sanders faced on the pending charge was not yet determined, and that he therefore had a motive to earn the State's favor.

This argument slights the steps counsel did take to correct any misimpression left by the prosecutor's statements.  Counsel had already elicited an admission that Sanders had not yet been to court regarding the charge for which he was in jail.[33]  And after the first of the two statements that Hunt claims misled the jury, counsel asked, "[Y]ou don't really know what is going to happen to you; do you?"  Sanders admitted he did not.  Thus, counsel did, in fact, elicit testimony indicating that Sanders was unsure what would happen to him and that, consequently, he had reason to prove himself useful to the State.

Hunt also argues that his counsel did not adequately question Sanders about his criminal record.  But Sanders had already testified in response to the State's questions that he had been convicted of receiving stolen property and robbery, and

---

[32]  In fact, the record does not reflect any explicit ruling by the trial court on counsel's objection to the first statement.  After each objection, the prosecutor asked Sanders if he wanted to change his testimony; questioning then continued.

[33]  On cross-examination, Hunt's counsel asked whether Sanders's probation had been revoked as a result of his new charge.  Sanders replied, "I haven't been to court on it yet."

that he was in jail on a pending theft charge. Perhaps counsel could have lingered over Sanders's record and further explored the facts underlying his convictions and pending charge. The attorney chose, instead, to impeach Sanders's testimony by exploring his motives. As the Supreme Court has recently explained, "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 790, 178 L. Ed. 2d 624 (2011) (quoting Yarborough v. Gentry, 540 U.S. 1, 8, 124 S. Ct. 1, 5, 157 L. Ed. 2d 1 (2003) (per curiam)). Hunt introduced no evidence in his Rule 32 proceedings to overcome this presumption. And given that the jury was already generally aware of Sanders's criminal record, we cannot say that "no competent counsel" would have made the same choice Hunt's counsel did. Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). Thus, Hunt has failed to show that counsel's performance in cross-examining Sanders was deficient.

Nor has Hunt shown that he was prejudiced by counsel's cross-examination. We agree with Hunt that Sanders's testimony was important to the State's case. Because the physician who autopsied Lane's body testified that there was no evidence of damage to the vaginal or anal area, Sanders's testimony provided

35

critical support for the State's theory that Hunt had sexually abused her with a broomstick.

Hunt has not shown, however, that a cross-examination of Sanders, conducted differently, would have been reasonably likely to produce a different result. As we noted above, Hunt produced no evidence at his Rule 32 proceeding of an agreement between Sanders and the State. Nor did he produce evidence that, had counsel further probed Sanders's criminal history, he would have revealed anything significantly more damaging to Sanders's credibility than the information already known to the jury. Ultimately, Hunt presented nothing to the Alabama courts that would have justified a finding of prejudice.

We therefore cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied federal law or unreasonably determined the facts when it rejected Hunt's claim that his counsel's cross-examination of Sanders amounted to ineffective assistance. Accordingly, the district court properly denied relief on this claim.

## C.

Hunt claims that his trial attorneys were ineffective when they failed to request jury instructions on intoxication and on lesser included offenses, and that,

in rejecting these claims, the Alabama Court of Criminal Appeals unreasonably applied Strickland and unreasonably determined the facts. We first address the instructions on intoxication and the lesser included offense of manslaughter. We then turn to the instruction on the lesser included offense of felony murder.

1.

A capital murder conviction requires proof of a specific intent to kill. See Ala. Code § 13A-5-40(b) (explaining that capital murder includes only murder as defined by Alabama Code § 13A-6-2(a)(1), which requires intent to kill, not as defined by § 13A-6-2(a)(2) and (3), which do not). Hunt argues that his attorneys should have exploited that requirement by requesting a jury instruction explaining that evidence of intoxication could show that he lacked that intent. Along with that instruction, Hunt contends, counsel should have requested an instruction on manslaughter, a lesser included—and noncapital—offense of which Hunt could have been convicted had the jury concluded that, although Hunt caused Lane's death, his intoxication cast sufficient doubt on whether he intended to do so.

In support of this argument, Hunt cites Fletcher v. State, 621 So. 2d 1010 (Ala. Crim. App. 1993). In Fletcher, witnesses in a murder trial testified that the defendant had been using crack cocaine on the night of the crime. Id. at 1020. The

Alabama Court of Criminal Appeals held that, given that evidence, the trial court's failure to give an intoxication instruction was plain error. Id. at 1022. The court explained that an intoxication instruction "should be given if 'there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt' on the element of intent." Id. at 1019 (quoting Coon v. State, 494 So. 2d 184, 187 (Ala. Crim. App. 1986)) (internal quotation marks omitted). The court also noted that "'[a] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position.'" Id. (alteration in original) (quoting Ex parte Oliver, 518 So. 2d 705, 706 (Ala. 1987)).

As Hunt points out, a number of witnesses at his trial mentioned his intoxication on the night of Lane's death. Loretta Martin testified that Hunt told her he had been "drinking and taking some medication that the doctor had prescribed for him," and that she had given a statement to an investigator that Hunt "was on some drugs and pills that he had gotten from the doctor . . . and . . . was drinking." Debra Twilley testified that a short time before Lane's death, Hunt appeared to have been drinking. James Carr Sanders testified that Hunt admitted he had been using cocaine on the night of the murder, and that Hunt had "[gone]

38

into a rage because he was messed up on dope." Ruby Savage testified that Hunt appeared to have been drinking and told her he was on pills.

We are, however, unpersuaded. Hunt asks us, in effect, to second-guess his trial attorneys' defense strategy. Their strategy was to argue that Hunt did not kill Karen Lane and that whoever did kill her did not sexually abuse her. Hunt's counsel could have, in addition, pursued an intoxication defense. But as we have explained before, "[c]ounsel is not required to present every nonfrivolous defense." Chandler, 218 F.3d at 1319. On the contrary, "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" Richter, — U.S. at —, 131 S. Ct. at 790 (quoting Gentry, 540 U.S. at 8, 124 S. Ct. at 5). Thus, "counsel's reliance on particular lines of defense to the exclusion of others . . . is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." Chandler, 218 F.3d at 1318.

Counsel's strategy in this case was not unreasonable. The evidence presented at trial made defending Hunt a difficult task. But it also offered enough support for counsel's line of defense—that Hunt was innocent and that Lane, in any event, was not sexually abused—that we cannot say no competent counsel

would have chosen it. As one law enforcement officer, John Vaughn, admitted, and as counsel emphasized, Hunt had no scratches or bruises on his body when he was arrested shortly after the murder, suggesting he had not been engaged in any struggle. Counsel also elicited testimony from Vaughn that some of the fingerprints found at the scene of the murder could not be matched to Hunt or Lane, and that no fingerprints were found on the stool and broomstick found near Lane's body. Counsel also elicited testimony from Steven Drexler, a state trace-evidence analyst, that the hair found on Lane's body, though consistent with Lane's hair, could not have been Hunt's hair.

To defend against the sexual abuse allegation, counsel elicited testimony from Dr. Embry that his autopsy revealed no evidence of damage to Lane's vaginal or anal area—and that roughly inserting a broomstick could damage the vagina. Counsel also tried to persuade the jury that the mucus found on the broomstick did not prove it had been inserted into Lane's vagina, eliciting testimony from state forensic analyst Larry Huys that the mucus could also have come from the mouth or nose. Counsel also contended in their closing argument that the mere presence of semen—without further evidence of how it was deposited—did not with

certainty establish sexual abuse.[34]

Having chosen a reasonable defense theory—or, rather, two—Hunt's attorneys were not required to pursue an intoxication defense as well. Such a defense would have been inconsistent with counsel's strategy of denying Hunt's guilt. See Dill v. Allen, 488 F.3d 1344, 1357 (11th Cir. 2007) (citing Johnson, 256 F.3d at 1178; Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000)) ("[C]onstitutionally sufficient assistance of counsel does not require presenting an alternative—not to mention unavailing or inconsistent—theory of the case."). An intoxication defense would have required the jury to posit that Hunt caused Lane's death, and to consider his mental state at the time. Hunt's attorneys were not required to raise such a defense—even in a request for a jury instruction—when they had reasonably chosen to argue that Hunt did not cause Lane's death. Cf. Nelson v. Nagle, 995 F.2d 1549, 1554 (11th Cir. 1993) (per curiam) (citing Jones v. Kemp, 678 F.2d 929, 931 (11th Cir. 1982) (per curiam)) ("[The defendant's] factual innocence defense and the intoxication defense were inconsistent. We find that [counsel's] decision not to present an intoxication defense was reasonable in

---

[34] In making this argument, counsel also emphasized Huys's testimony that the semen could have been deposited as much as an hour before Lane's death.

41

light of the factual innocence defense.").[35]

Counsel's failure to request an intoxication instruction is further justified by the implausibility, on this record, of an intoxication defense.  See Dill, 488 F.3d at 1357–60 (holding that counsel was not deficient in failing to pursue an alternative line of defense in part because that defense would have been "unavailing").  Under Alabama law, voluntary intoxication can negate specific intent only if it "amount[s] to 'insanity.'"  Crosslin v. State, 446 So. 2d 675, 681–82 (Ala. Crim. App. 1983) (quoting Maddox v. State, 17 So. 2d 283, 285 (Ala. Ct. App. 1944)).  The defendant's intoxication must "render impossible" the requisite mental state.  Id. at 682 (emphasis added) (citing Gautney v. State, 222 So. 2d 175 (Ala. 1969); Walker v. State, 9 So. 87 (Ala. 1891)).  It must be so extreme, in other words, that it renders the defendant "incapable of consciousness that he is committing a crime; incapable of discriminating between right and wrong."  Green v. State, 342 So. 2d 419, 421 (Ala. Crim. App. 1977).

---

[35] Characterizing his trial attorneys' strategy as a "'reasonable doubt' defense," Hunt argues that an intoxication defense would have been consistent with that strategy: the intoxication defense, after all, would simply have created a "reasonable doubt" about his intent to kill.  Principal Br. of Pet'r-Appellant 33.  This argument misses the point.  Trial counsel's strategy was to create a reasonable doubt by arguing that Hunt did not kill Karen Lane—a scenario inconsistent with the claim that although Hunt killed Lane, he was intoxicated when he did so.

A few vague references to alcohol, unspecified pills, and cocaine do not support the conclusion that Hunt's intoxication reached such an extraordinary level.[36] Nor does testimony that Hunt later said he had "lost his head" on the night of Lane's death[37]—words that could describe homicidal rage, considered with regret after it has passed, just as easily as they could describe intoxication amounting to insanity.

Even if the mere mention of drugs and alcohol were enough to suggest that Hunt was too intoxicated to form the intent to kill, the evidence of Hunt's conduct on the night of Lane's death belies any such suggestion. Hunt's conduct suggests a perfectly adequate understanding of his actions—even premeditation. Cf. White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) (holding that counsel's decision not to present an intoxication defense "because it was inconsistent with the deliberateness of [the defendant's] actions during the [crime]" was reasonable).

---

[36] In Fletcher v. State, by contrast, the evidence at least gave some indication of the amount of crack cocaine the defendant had consumed. See 621 So. 2d 1010, 1020 (Ala. Crim. App. 1993) ("[T]he State introduced evidence that the [defendant] began smoking crack cocaine around 6:00 or 6:30 p.m. on the night of the murder. Dailey testified that the [defendant] smoked at least one rock of crack cocaine with him prior to the time they walked to Ms. Scott's house. According to Ms. Scott, the [defendant] smoked 'four or three' rocks of crack cocaine with her and Dailey. After Dailey left, she and the [defendant] smoked another rock of crack cocaine.").

[37] Loretta Martin testified that Hunt told her he had "lost his head and couldn't control himself."

43

One striking example is Hunt's request, some time between 11 p.m. and 12:15 a.m.,[38] to borrow Debra Twilley's car. Twilley testified that when she asked why he needed it, Hunt replied, "I've got some stuff I need to do. . . . It's not wise that I'm seen my van." One struggles to imagine such caution from anyone whom intoxication has rendered "incapable of consciousness that he is committing a crime." Green, 342 So. 2d at 421.

In addition to this remarkably lucid exchange, Hunt had a number of coherent conversations about his anger toward Lane on the night of her death. He even suggested more than once that he might resort to violence. When Hunt visited James Mullinax and Hortencia Ovalle at their home in Jasper around 8 or 8:30 p.m., he "kept on saying he was going to have to do something about the problem." Hunt also said, more ominously, that he planned to "fuck somebody up." Between 9:30 and 10 p.m., Hunt called Gilliland, demanding that she tell him where Lane was. Failure to do so, he warned, would be "detrimental to [Gilliland]." He also told Gilliland "he was ready to go back to prison if that [was] what it took." Hence, Hunt was not too intoxicated to articulate his frustration with

---

[38] Debra Twilley testified that Hunt was present when she arrived home from work shortly after 11 p.m. and that he left at about 12:15 a.m. The conversation we discuss here occurred at Twilley's home during the intervening time.

Lane, or to voice an inclination to act on that frustration violently.

Some evidence suggested, moreover, that Hunt did act on that frustration that night: according to the testimony of Debra Twilley and W.O. Sanders, Hunt set fire to Lane's house. The evidence further suggests that when Hunt burned the house, he understood what he did and acted intentionally. Hunt told Twilley that by burning the house, he had "[taken] away the only thing that [Karen] had." He also told Twilley he had burned the house by "pour[ing] gas on it and set[ting] it afire." That Hunt evidently could—and did—form the intent to burn the house makes it difficult to believe he was too mentally incapacitated to form the intent to kill.

The evidence also showed that Hunt spent much of the night in pursuit of Lane, driving from town to town in Walker County. That he did so further undermines any claim that he was too impaired to form the intent to kill. At 6 p.m. the evening before the murder, Hunt was at Tina Gilliland's apartment in Cordova. An hour or so later, he was at Clinton Cook's residence in Parrish, a seven-mile, twenty- to thirty-minute drive from Cordova, when Gilliland arrived with Lane. Shortly after leaving Cook's place, he drove to Jasper, roughly eight miles from Parrish, arriving at Mullinax and Ovalle's home around 8 or 8:30 p.m. Thereafter,

45

he made the drive to Cordova, about eight miles from Jasper. Shortly after 11 p.m., however, Hunt was back in Jasper, this time at Twilley's home. Then, at midnight or 12:30 a.m., he was seen in downtown Cordova, chasing Lane in his car. He apparently remained in Cordova until at least 2:44 a.m., when, from Gilliland's apartment, he called Cook to report that Lane needed to be taken to a hospital. But by 6 a.m., he had returned in his van to Mullinax and Ovalle's home in Jasper.

On the evidence presented at trial, therefore, the suggestion that Hunt was too intoxicated to form the intent to kill would have been incredible. Perhaps, despite the weakness of the evidence of intoxication, Hunt would have been entitled upon request to an instruction on the intoxication defense. As Hunt points out, the Alabama Court of Criminal Appeals stated in Fletcher that "where there is evidence of intoxication, the extent to which the accused is intoxicated is a question to be decided by the jury." 621 So. 2d at 1021. Even on that generous assumption, though, there is no realistic possibility that, had an instruction been given, the jury might actually have concluded that Hunt's intoxication amounted to insanity and acquitted him of capital murder on that basis. Hunt's attorneys were not required to supplement their defense with an inconsistent and utterly

implausible alternative theory. See Dill, 488 F.3d at 1357. Thus, we cannot say that no "fairminded jurist[]," Richter, — U.S. at —, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004)) (internal quotation marks omitted), could agree with the Alabama Court of Criminal Appeals' holding that counsel's performance in failing to request an intoxication instruction was not deficient, Hunt, 940 So. 2d at 1067.

Even if counsel's performance in failing to request an intoxication instruction were deficient, Hunt has not shown that he was prejudiced by that failure. For the reasons explained above, there is no reasonable probability that requesting an instruction on intoxication and manslaughter would have changed the outcome of Hunt's trial. Cf. Hall v. Head, 310 F.3d 683, 695–97 (11th Cir. 2002) (holding that counsel's failure to obtain an instruction on the lesser included offense of voluntary manslaughter did not prejudice the defendant because there was no reasonable probability that the jury would have convicted him of voluntary manslaughter rather than capital murder). Accordingly, the district court properly denied habeas relief on this claim.

2.

Hunt claims that his attorneys rendered ineffective assistance when they

47

failed to request a jury instruction on the lesser included offense of felony murder. But because Hunt did not challenge the circuit court's denial of this claim in appealing the court's Rule 32 decision, it is procedurally defaulted. We thus reject it without addressing its merits.

A federal court generally may not grant habeas relief to a state prisoner unless that prisoner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).[39] The prisoner has not met this requirement if he has failed to exploit "any available procedure" by which he has the right to raise his claim in state court. Id. § 2254(c). Even if, like Hunt, a prisoner seeks collateral review of his conviction in state court, he has exhausted his state remedies only if "the state court that is usually the final arbiter of such collateral attacks on criminal convictions was . . . afforded a fair opportunity to rule on [his claim]." Collier v. Jones, 910 F.2d 770, 773 (11th Cir. 1990). In the context of this case, the prisoner must appeal the Rule 32 court's denial of his claim to the court of criminal appeals in order to satisfy the exhaustion requirement. See Maples v. Allen, 586 F.3d 879, 886 (11th Cir. 2009) (per curiam) (concluding that

---

[39] A habeas petitioner is relieved of this requirement in the "absence of available State corrective process" or under "circumstances . . . that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B). This exception is not at issue in this case.

a federal habeas petitioner had not exhausted his remedies in Alabama state court because he failed to appeal the Rule 32 court's denial of his claim). Moreover, after the court of criminal appeals affirms the Rule 32 court's denial of a claim, the prisoner, to exhaust all available remedies, must petition the Alabama Supreme Court for certiorari review. Pruitt v. Jones, 348 F.3d 1355, 1359 (11th Cir. 2003).

In sum, Hunt was required to appeal the circuit court's Rule 32 denial of his counsel's failure to request a felony-murder instruction to both the court of criminal appeals and the supreme court. But neither the briefs he submitted to the court of criminal appeals nor his subsequent certiorari petition asserted that his counsel was ineffective in failing to request a felony-murder instruction. That claim is therefore unexhausted. And when, because of a state procedural bar, further efforts to exhaust state remedies would be futile, the unexhausted claim is procedurally defaulted. Bailey v. Nagle, 172 F.3d 1299, 1305 (11th Cir. 1999) (per curiam); Collier, 910 F.2d at 773. In this case, Alabama's bar against successive Rule 32 petitions would make exhaustion unavailable. See Ala. R. Crim. P. 32.2(b), (d).[40] Hunt's felony-murder-instruction claim is, accordingly,

---

[40] Under the Alabama rules, "[i]f a petitioner has previously filed a petition that challenges any judgment, all subsequent petitions by that petitioner challenging any judgment arising out of that same trial or guilty-plea proceeding shall be treated as successive petitions." Ala. R. Crim. P. 32.2(b). And Rule 32.2 provides that "[i]n no event can relief be granted on a

49

procedurally defaulted.

Hunt's argument to the contrary is unavailing. Hunt could hardly dispute that he failed to argue to the court of criminal appeals and the supreme court that his trial attorneys should have requested a felony-murder instruction. Instead, he insists that he exhausted the claim by making a general argument that, in deciding numerous claims—one of which happened to be the felony-murder-instruction claim, though Hunt did not alert the Alabama appellate courts to that fact—the circuit court misconstrued the Strickland standard.

That argument, however, was not enough to "fairly present" the claim for resolution by the state appellate courts. Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (per curiam) (alteration omitted) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 512, 30 L. Ed. 2d 438 (1971)) (internal quotation marks omitted). It therefore was not enough to exhaust the claim. To satisfy the exhaustion requirement, "petitioners [must] present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation." Kelley v. Sec'y for the Dep't of Corr., 377 F.3d 1317, 1344–45 (11th Cir. 2004) (citing Picard, 404

claim of ineffective assistance of trial or appellate counsel raised in a successive petition." Id. 32.2(d) (emphasis added).

U.S. at 277, 92 S. Ct. at 513). In other words, "[t]he ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." Id. at 1345 (quoting Martens v. Shannon, 836 F.2d 715, 717 (1st Cir. 1988)) (internal quotation marks omitted).

Hunt's felony-murder-instruction claim was not "presented face-up and squarely" to the Alabama appellate courts. Id. (quoting Martens, 836 F.2d at 717) (internal quotation marks omitted). Because his briefs and his certiorari petition never even asserted that his attorneys were ineffective in failing to request a felony-murder instruction, the reasonable reader could hardly have been expected to ascertain that claim's "specific factual foundation." Id. (citing Picard, 404 U.S. at 277, 92 S. Ct. at 513). Hunt alerted the appellate courts to only one facet of the felony-murder-instruction ineffective-assistance issue: whether the circuit court, and then the court of criminal appeals, had correctly understood the Strickland prejudice standard. Hunt did not, however, call on either of the appellate courts to evaluate the underlying felony-murder-instruction claim by applying the Strickland standard to it. Indeed, those courts could have addressed Hunt's highly general arguments about the Strickland prejudice standard[41] without even discovering that

_____

[41] Hunt's principal brief to the court of criminal appeals simply quotes general language interpreting the Strickland prejudice standard that appears numerous times throughout the circuit

51

he had raised a felony-murder-instruction claim in the circuit court. Hunt thus

failed to "fairly present" that claim on appeal.[42] <u>Henry</u>, 513 U.S. at 365, 115 S. Ct.

at 888 (alteration omitted) (quoting <u>Picard</u>, 404 U.S. at 275, 92 S. Ct. at 512)

(internal quotation marks omitted). Because this claim is procedurally defaulted,

we reject it without addressing its merits.

D.

Hunt argues that the court of criminal appeals refused to consider whether

the cumulative effect of counsel's alleged errors amounted to ineffective assistance

and, in doing so, unreasonably applied clearly established federal law. We reject

this claim. Even if we were to determine that clearly established federal law

---

court's order—"[p]rejudice cannot merely be alleged; it must be affirmatively proved"—and criticizes it in general terms. Brief of Appellant at 41–43, <u>Hunt v. State</u>, 940 So. 2d 1041 (Ala. Crim. App. 2005) (No. CR-02-0813) (alteration in original) (quoting Final Order at 57–58, <u>Hunt v. State</u>, No. CC-89-76.60 (Ala. Walker Cnty. Cir. Ct. Dec. 17, 2002)) (internal quotation marks omitted). His petition for certiorari, similarly, uses general language quoted from the court of criminal appeals' opinion to argue that that court improperly required extrinsic evidence of prejudice.

[42] It appears that the court of criminal appeals, whether fairly presented with the issue or not, may in fact have decided Hunt's felony-murder-instruction claim on the merits, albeit implicitly. Hunt challenged the circuit court's rejection of numerous claims, including the felony-murder-instruction claim, on the ground that the circuit court had erroneously concluded that they were time barred. The court of criminal appeals agreed with Hunt but upheld the circuit court's rulings—without specifically mentioning the felony-murder-instruction claim—on the alternative ground that Hunt had failed to prove prejudice. See <u>Hunt</u>, 940 So. 2d at 1054–55. But even if the court of criminal appeals did decide Hunt's felony-murder-instruction claim, Hunt failed to fairly present that claim to the Alabama Supreme Court in his petition for certiorari. Hunt therefore failed to exhaust his state remedies.

mandates a cumulative-effect analysis of ineffective-assistance claims, Hunt would not be entitled to relief: he has not shown that in this case the cumulative effect of counsel's alleged errors amounted to ineffective assistance.

IV.

For the foregoing reasons, the judgment of the district court denying Hunt's petition for a writ of habeas corpus is

AFFIRMED.